**UNITED STATES of America**

**v.**

**Norman Laverne WILCOX,**
**a/k/a "Nasty".**

**Crim. No. 72–418.**

United States District Court,
E. D. Pennsylvania.

April 11, 1973.

Robert E. J. Curran, U. S. Atty., John F. Penrose, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Nicholas M. D'Alessandro, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Defendant is charged with participating in a robbery of the Continental Bank at 7501 Stenton Avenue, Philadelphia, on February 24, 1972. Defendant has moved to suppress $7,930 in United States currency, alleged by the government to be proceeds of the bank robbery, and certain other items which were seized by F.B.I. agents during a warrantless search of an apartment at 2854 West Oakdale Street, Philadelphia, later that day.

*I. Facts*

*A. The Information*

According to the testimony of Special Agent Patrick Kelly, the F.B.I. had learned from an informant that a bank robbery would occur on the afternoon of February 24, 1972 in the northern sector of Philadelphia. The informant also provided the names of two of the participants in the robbery, as well as information as to the *modus operandi*. The two named participants were Willie Wil-

liams and an individual nicknamed "Nasty".[1]

The F.B.I. also had information from the informant that these individuals had been involved in a previous bank robbery on January 31, 1972. The informant stated that a red Chrysler belonging to Willie Williams would be used in the February 24 bank robbery, and that after the robbery, the participants would go to the residence of Jean Holland, Willie Williams' girlfriend, at 2452 Chadwick Street, Philadelphia, in order to divide the proceeds of the robbery. The F.B.I. was also told that the participants would return to their families in order to leave money, and then would leave town immediately.

## B.  *The Robbery*

At 1:38 p. m. on February 24, 1972, Special Agent Kelly learned that the Continental Bank at 7501 Stenton Avenue had just been robbed. Immediately he and other agents went from the F.B.I. office in the Widener Building directly to the residence of Jean Holland, at 2452 Chadwick Street, in search of Willie Williams and "Nasty".

## C.  *2452 Chadwick Street*

The agents arrived in the vicinity of 2452 Chadwick Street at approximately 2:00 p. m., and began a surveillance of the house. Near the house they noticed a red Chrysler automobile which they identified as belonging to Willie Williams. The agents observed Williams leave the house, and arrested him a few blocks away.

The agents then entered the apartment of Miss Jean Holland at 2452 Chadwick Street and conducted a room-to-room search. As a result of the search, the agents claim to have found a nine millimeter automatic revolver, sev-

eral thousands of dollars which had been stolen from the bank, and a ski mask. They also learned that "Nasty" had been there that afternoon. Miss Holland also told the agents that Pearl Harris of 417 N. 38th Street, Philadelphia, knew "Nasty".

## D.  *417 N. 38th Street*

The agents left Jean Holland's apartment at 2452 Chadwick Street at approximately 6:30 or 7:00 p. m. and proceeded to Pearl Harris's apartment at 417 N. 38th Street in order to develop "Nasty's" identity. The agents arrived at 417 N. 38th Street at approximately 8:00 p. m., and learned from Pearl Harris, identified as "Nasty's" girlfriend, that "Nasty's" true name was Norman Laverne Wilcox.

Agent Kelly immediately obtained information that gave him reason to believe that Norman Laverne Wilcox resided at 2854 West Oakdale Street, Philadelphia.

Thus, by 8:00 p. m., the agents had in their possession all the information that was or would be available bearing on the question of probable cause (1) to arrest Wilcox; and (2) to search his home.

## E.  *2854 West Oakdale Street*

Agent Kelly and his colleagues left Pearl Harris's house at 417 N. 38th Street at approximately 8:30 p. m., and proceeded to 2854 West Oakdale Street. Agent Kelly and five other agents arrived in the vicinity of 2854 West Oakdale Street at approximately 9:00 p. m. and began a surveillance of the premises which lasted for one-half hour. Three agents were staked in the rear of the building, and Agent Kelly and two other agents were stationed in front.

At 9:30 p. m., Agent Kelly, with his gun drawn and with two other agents

---

1. "Q [By Mr. Penrose]  Did you have any names at all, nicknames, any sort of names of the individuals who would be involved in this February 24 robbery and had been involved in the January 31 robbery?

"A [By Special Agent Kelly]  I did.
"Q  Tell us as to the nickname you had.
"A  The nickname I had was 'Nasty'." [N.T. 9].

behind him, knocked at the outside door of 2854 West Oakdale Street. According to his account of the incident, Agent Kelly told the woman who answered the door that he was seeking Norman Laverne Wilcox for bank robbery. Kelly testified that the woman identified herself as Mary Wilcox, wife of Norman Laverne Wilcox.

Mrs. Wilcox replied to agent Kelly that only she and her children were in the apartment, and that "Nasty" or her husband was not there.[2] They agree that, nonetheless, Kelly insisted on searching the apartment.[3]

The agents then followed Mrs. Wilcox up the stairway to her apartment, and conducted a "body search" for defendant, which lasted approximately three minutes. After the body search, Agent Kelly asked for Mrs. Wilcox's permission to conduct a second, more thorough, search "for instrumentalities of the crime"—"money or weapons." Kelly also told Mrs. Wilcox that if she did not agree to the search, the agents would get a warrant.[4] Kelly testified that at this point Mrs. Wilcox signed Form FD–26, Consent to Search Premises, which was labeled Exhibit GS–1.

Agent Larry E. Doss testified that he entered 2854 Oakdale Street approximately one minute after Agent Kelly and participated in a second search for contraband. During the second search of the apartment, Doss found a brown paper bag full of money under the mat-

tress in the bedroom where two children were watching television.[5]

It is this bag of money, a hat, and certain papers seized as a result of the searches at 2854 West Oakdale Street on February 24, 1972 that defendant seeks to suppress as evidence against him in this prosecution.

## II. Standing

■ Although Mrs. Wilcox testified that Oakdale Street was not defendant's home, we are convinced that he has standing to complain of the warrantless search of his wife's apartment. F.R.Cr. P. 41(e) provides, "A person aggrieved by an unlawful search and seizure may move the district court * * * to suppress for the use as evidence anything so obtained." In Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1970), the Court held:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U.S. at 261, 80 S.Ct. at 731.

Here, the two searches of 2854 West Oakdale Street were clearly directed at defendant, within the meaning of Jones. In the first place, the agents proceeded to the Oakdale Street address for the

---

2. Mrs. Wilcox also testified that she and her two children have lived at 2854 West Oakdale Street since August, 1971. [N.T. 152–153, 178.] She denied that her husband, Norman Laverne Wilcox, had ever lived there [N.T. 153], although she acknowledged that he did have a key and that he regularly visited there on weekends. [N.T. 177, 180.] Mr. and Mrs. Wilcox have been married seven years and have two children. They have been separated for six years, and lived together only during the first four months of their marriage. [N.T. 174.]

3. [Agent Kelly] "I advised her that we were going to search her apartment for Wilcox, and she, if I recall correctly,

advised me that he wasn't there." [N.T. 30].
[Agent Kelly] "We are going to have to take a look." [N.T. 46].

4. [Agent Kelly] "She asked me what I would do if I did not receive her permission to search the apartment, and I advised her that I would try—I think my words were: I will go get a warrant. To which, if I recall correctly, she replied: 'Then I might as well let you search.'" [N.T. 32].

5. Mrs. Wilcox, however, testified that Agent Doss claimed to have found a bag of money *before* Agent Kelly asked her to sign the consent form. [N.T. 163–164.]

avowed purpose of arresting defendant. Then, the agents made a "body search" of the premises in quest of defendant, followed by a more lengthy search for instrumentalities or fruits of the crime. Having searched the apartment at 2854 West Oakdale Street in the belief that defendant could be found there, and having seized from that apartment money and certain other items now attributed to defendant, the government is scarcely in a position to deny that these searches were directed at defendant.

The testimony indicates that defendant had a sufficient interest in the premises to justify any expectations of privacy which he may have had there and to qualify him as a "person aggrieved by the search." According to Mrs. Wilcox's testimony, defendant had a key to the apartment, and he regularly visited his wife and two children there on weekends. Merely because defendant now asserts that his actual residence was at a place other than the premises searched does not diminish his standing as an aggrieved person. *Cf.* United States v. Birrell, 470 F.2d 113 (C.A. 2, 1972).

In Birrell, the police were searching for evidence relating to the death of the tenant of the apartment, not for evidence of crimes committed by the defendant in that case. The evidence seized in Birrell was used against the defendant in a criminal prosecution entirely unrelated to the death of the tenant. Here, the facts present an even stronger basis for defendant's standing than in Birrell, for the agents went to Mrs. Wilcox's apartment for the very purpose of arresting defendant, and they searched the apartment for the instrumentalities and fruits of a crime which they believed defendant had committed.

### III. *Probable Cause and The Search*

■ The agents initially entered the apartment at 2854 West Oakdale Street for the purpose of arresting defendant. Probable cause for an arrest without a warrant may be based upon information received through an informant, rather than upon the agent's direct knowledge, so long as the informant's statement is reasonably corroborated by other matters within the agent's knowledge. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The finding of probable cause by a magistrate may also be based upon reliable hearsay under F.R.Cr.P. 4(a).

■ Similarly, an informant's statement, reasonably corroborated by other matters within the agent's knowledge, may suffice to establish probable cause for a warrantless search. Jones v. United States, 362 U.S. 257, 269–271, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960).

The informant here told the F.B.I. that a bank robbery would take place on a certain date in a certain section of Philadelphia, that a red Chrysler belonging to Willie Williams would be involved in the robbery, that the proceeds of the robbery would be divided at a certain location, and that the participants in the robbery would include Willie Williams and an individual nicknamed "Nasty."

The robbery described did in fact occur. Willie Williams' car was found on Chadwick Street and Williams was arrested leaving the Chadwick Street apartment shortly after the robbery. Moreover, inside the apartment, the agents did in fact find money identified as proceeds of the robbery. Also, inside the apartment, both Jean Holland and a child acknowledged that "Nasty" had been there earlier that day.

Shortly after 8:00 p. m., the agents had identified "Nasty" as Norman Laverne Wilcox, and had ascertained his address, thus establishing the necessary link between defendant and the bank robbery. Only part of the robbery proceeds was found at Chadwick Street, the now-corroborated informant had included Wilcox ("Nasty") in his information and had also said the *modus operandi* would be to split the money and separate.

■ Although no testimony was offered as to the previous reliability of the

informant, the concurrence of all of these events, as predicted in detail by the informant, is sufficient to establish the credibility of the informant. *See* United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); United States v. McNally, 473 F.2d 934 (C.A. 3, 1973). Since these events occurred *before* the entry in question, they may be relied upon to establish the credibility of the informant. *Cf.* Bailey v. United States, 128 U.S.App.D.C. 354, 389 F.2d 305, 308 (1967).

We conclude that by shortly after 8:00 p. m., the agents had probable cause to believe that (1) Wilcox participated in the crime; (2) that he would be at the Oakdale Street apartment; and (3) that the remainder of the proceeds of the robbery would be there.

However, in United States v. Rubin, 474 F.2d 262, (C.A.3, 1973), Judge Rosenn said, at p. 268:

"\* \* \* Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient. Probable cause must exist to support *any* search; the role of the warrant-issuing magistrate is to determine whether probable cause exists. *Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant.*

"When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified." (Emphasis added.)

Here, the absence of exigent or exceptional circumstances is most clearly demonstrated by the conduct of the agents themselves. Shortly after 8:00 p. m. they had possession of all the information they would ever have going to the existence of probable cause. It was conceded by the government at argument that a search warrant could be obtained in 1½ to 2 hours. (*See infra.*) Of the six agents then involved in the case, none was sent to attempt to get a warrant. Rather, all six went to Oakdale Street where they arrived at about 9:00 p. m.

Although seven and one-half hours had passed since the robbery, approximately six hours since the arrest of Williams, more than two hours since the end of the interview with Jean Holland, and one hour since the identification of "Nasty" by Pearl Harris, the agents waited still another 30 minutes until 9:30 before their warrantless entry and search (an hour and a half from full possession of probable-cause knowledge. *See supra.*)

Perhaps the most graphic exhibition of the lack of exigent circumstances, and of the agents' belief that none existed, is Agent Kelly's statement to Mrs. Wilcox that if she did not consent to the search he would get a warrant. (*See infra* under "IV. Consent".) This was either (1) true; or (2) unforgivable deception. If Agent Kelly's statement was honest, it manifested a belief that there was opportunity to seek a warrant. If not, it was the kind of misstatement we cannot condone on the part of law enforcement officers.

In Rubin, *supra,* the court upheld a warrantless search, concluding that exigent circumstances existed. But this case is totally unlike Rubin. There was nothing here whereby the agents "might reasonably have believed that [they were] confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" Schmerber v. California, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966). In Rubin, when one of the defendants was arrested, he called to a person present, "Call my brother," but there was nothing here to indicate in any way that "the possessors of the contraband [were] aware that the police [were] on their trail", United States v. Rubin, *supra.* The exigent circum-

stances that existed in Rubin simply did not exist here.

We, of course, recognize that in Rubin the court did not purport to differ with Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), as indeed it could not. Rather, we read Rubin as holding only that the test of evidence in the process of destruction is too narrow a reading of those cases, and all that is required is the belief of threatened destruction. The mere presence on the premises of persons other than defendant is not enough to justify such a belief and an ensuing warrantless search.

In Vale, *supra*, Mr. Justice Black pointed out in his dissent, 399 U.S. at 41, 90 S.Ct. at 1975:

" * * * Furthermore the police arrival and Vale's arrest were plainly visible to anyone within the house, and the police had every reason to believe that someone in the house was likely to destroy the contraband if the search were postponed."

Similarly, in Chimel, *supra*, Mr. Justice White noted in dissent, 395 U.S. at 775, 89 S.Ct. at 2046:

" * * * Moreover, had the police simply arrested petitioner, taken him off to the station house, and later returned with a warrant, it seems very likely that petitioner's wife, who in view of petitioner's generally garrulous nature must have known of the robbery, would have removed the coins."

The majority nonetheless held the searches of the premises unreasonable and violative of the Fourth Amendment.

So here, although Wilcox's wife and two small children were present, if Wilcox had been there and had been arrested, even a search incident to a lawful arrest would not have justified this search of the entire apartment. And there was not even that to justify it. Wilcox was not there to be arrested.

## IV. Consent

Finally, we reject the government's contention that Mrs. Wilcox voluntarily consented to the search of her apartment. Agent Kelly testified:

"She asked me what I would do if I did not receive her permission to search the apartment, and I advised her that I would try—I think my words were: I will go get a warrant. To which, if I recall correctly, she replied: 'Then I might as well let you search.' "

If this testimony stood alone, we would have grave doubts as to the validity of the search. *Cf.* United States v. Boukater, 409 F.2d 537, 538 (C.A.5, 1969). However, Agent Kelly's brief testimony was expanded by Mrs. Wilcox, whose testimony on this point we find credible. She testified that Kelly said to her:

"If you don't sign, we will call 17th and Montgomery and get a warrant and we will sit right here and wait on it and they [the Philadelphia police] will tear your house up and won't fix it up, but if we search we will fix your house back up."

Mrs. Wilcox then testified that she replied to Agent Kelly:

"I don't have no choice; you know, you have already searched."

Consent to an otherwise unprivileged search must be voluntary, and the burden is on the government to establish the legal sufficiency of a consent. Judd v. United States, 190 F.2d 649 (C.A.D.C.1951). The question of the voluntariness of consent to a warrantless search is a question of fact to be decided by the trier of fact in light of the attendant circumstances. United States ex rel. Gockley v. Myers, 378 F.2d 398 (C.A.3, 1967). Coercion is implicit in situations where consent is obtained "under color of the badge," and the government must show that there was no coercion in fact. United States v. Page, 302 F.2d 81 (C.A.9, 1962); Nelson v. United States, 93 U.S.App.D.C. 14, 208 F.2d 505 (1953).

Kelly's "request" had been preceded by the entry of six armed men into the apartment with guns drawn and a body search of the premises, in the presence of Mrs. Wilcox and her two small children. The threat was not only to get a warrant, but to occupy the premises until there could be a disruptive search by the Philadelphia police. The totality of the circumstances here lead us to conclude that the government has not sustained its burden of showing that the consent was voluntary.

For the foregoing reasons, we have previously entered an order granting defendant's motion to suppress.