351 A.2d 265

**COMMONWEALTH of Pennsylvania**

v.

**Donald D. TREFTZ, Appellant.**

Supreme Court of Pennsylvania.

Argued May 8, 1975.

Decided Jan. 29, 1976.

616

Charles F. Gilchrest, Routman, Moore, Goldstone & Valentino, Sharon, for appellant.

Joseph J. Nelson, Dist. Atty., R. F. Banks, Mercer, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

## OPINION

JONES, Chief Justice.

Appellant, Donald P. Treftz, was convicted of murder in the first degree following a jury trial and sentenced to life imprisonment. Motions in arrest of judgment and for a new trial on the ground of after-discovered evidence were denied by the trial judge sitting for the Court of Common Pleas of Mercer County. This appeal followed.[1]

Appellant raises several questions on appeal: one, involving the trial court's denial of a motion to suppress certain evidence allegedly obtained in violation of appellant's fourth amendment rights; another, questioning the sufficiency of the evidence against appellant such as to warrant the jury verdict of guilt; and, lastly, whether or not certain post trial evidence justifies the granting of a new trial.

Appellant Treftz was president of the Masury, Ohio chapter of a motorcycle club known as the "Breed" Motorcycle Club. He had moved to Lyndon, Illinois, on June 1, 1973, and was arrested there on November 12 of that year on charges stemming from the murder of one Mark Allen Chancellor on October 13, 1973. At the time police officers executed a defective[2] search warrant covering a certain portion of a ninety acre parcel of land, owned by a Mr. James Gilkey and located in Mercer County, Pennsylvania, the appellant Treftz was in the State of Illinois as well.

The search pursuant to said warrant resulted in the discovery of Chancellor's body buried in a shallow grave

1. Jurisdiction of this Court is had by virtue of the Act of July 31, 1970, P.L. 673, Art. II, Section 202(1), 17 P.S. Section 211.202(1). (Supp.1975).

2. The Commonwealth has conceded that the search warrant, based upon an informant's tip, was defective in that it was not supported by an affidavit showing probable cause for its issuance.

618

148 yards from the backyard of a small farm house in which James Gilkey's nephew John and the latter's family had lived since 1960. John Gilkey was also a member of the Breed's Ohio chapter and the evidence adduced at trial showed that the farm house was occasionally used as a meeting ground for club members.

The trial testimony further revealed that Chancellor and another individual were brought to, the Gilkey residence on the day of October 13 to meet with the Ohio chapter members for the supposed purpose of joining the club. Instead, club "prospect" Chancellor was beaten and later shot to death.

Appellant Treftz sought unsuccessfully at his pre-trial evidentiary hearing to have the body of Mark Chancellor suppressed from trial on the grounds that the body was discovered during an illegal search of the wooded area directly behind the Gilkey residence in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania State Constitution.

I

A brief description of the searched premises and a relation of the appellant's interest in those premises is necessary in order to fully determine whether or not there was a reasonable expectation of privacy on the part of the appellant such as to confer standing upon him to attack the constitutionality of the search.

James Gilkey is the owner of the ninety acre tract of land on which the house occupied by his nephew John is located. John Gilkey and his family have lived there under an informal understanding between the uncle and nephew established over the years, that in return for the upkeep of the house, the John Gilkey family would be permitted to live in the house rent-free, having unrestricted access to the surrounding land. The house itself is apparently quite small, fronting a main rural route.

Immediately behind the house is a cleared area (an out-house and a garage are located to the side of the house). At the furthest end of this cleared yard is a garbage pile. A fence separates this portion of the "dwelling" from the wooded area overgrown with foliage where state police officers uncovered the body of Chancellor on October 26, 1973. At one time this wooded area was used as a pasture, but such use ended approximately twenty-five years ago. The elder Mr. Gilkey testified that the area has since been freely open to hunters, although he further testified that he had not seen hunters upon the premises during the past two years.

Six Pennsylvania State Police Officers arrived at the farm house at 9:30 a.m. on October 26 prepared to execute a search warrant covering that address.[3] No one was on the premises at the time, nor were the officers able to reach the elder Gilkey. The officers proceeded to the rear portion of the home and then began to fan out beyond the fenced area, looking for possible grave sites. At approximately 10:30 a. m., the body of the deceased victim was discovered in a shallow grave located 148 yards from the dwelling area. Testimony at the pre-trial suppression hearing disclosed that while the grave was entirely covered by dirt, the head of the deceased was buried fifteen inches underground, his buttocks under ten inches of dirt, and his feet under only four inches of dirt.

The entry of the officers and the digging on the land were not incident to a lawful arrest of the defendant or any other person.

As noted previously, appellant Treftz was in Lyndon, Illinois, at the time of the October 26 search and seizure. The record below discloses that the appellant had known John Gilkey and his wife Mary since September of 1972. Treftz moved to Illinois in June of 1973. He testified at

---

**3.** The officers arrived in marked cars parking in the front drive-way.

his suppression hearing that prior to that move, he had stayed overnight at the Gilkey residence on approximately ten different occasions because it was "Either too late at night and [sic] too drunk to go back to Sharon, so I just stayed there." [4] In addition, appellant testified that in March 1973, Mary Gilkey asked him to stay at the farm house with herself and her children, John Gilkey being in police custody at that time on charges stemming from the Chancellor murder. Appellant stayed on that occasion approximately four to five days. Although he did not pay rent to Mary Gilkey, he did purchase groceries for the family.

Following his move to Illinois, appellant regularly visited the Gilkey residence on a twice-monthly basis. The Gilkeys did not provide appellant with a key, but on those weekends that they expected his visit, the Gilkeys either stayed at home awaiting his arrival or otherwise left the door unlocked. In August of 1973, appellant stayed at the farmhouse for almost two weeks while his motorcycle was being repaired at a nearby service station. Again, he did not pay rent but contributed money towards groceries and gasoline.

During these visits to the Gilkey residence, appellant had free access throughout the house and surrounding yard. He testified that on certain occasions he would go out with other club members into the backwoods area for target practice or club meetings. He stored two of his motorcycles on the Gilkey property for varying lengths of time, but as of October 1, 1973, the appellant no longer had any personal property or belongings remaining with the Gilkeys. Furthermore, the last visit testified to by the appellant was on October 1.

Following a full evidentiary hearing, the trial court denied appellant's motion to suppress the corpse [5] of

4. At p. 48 supp. transcript. The reference to "Sharon" is Sharon, Mercer County, Pennsylvania, where appellant resided prior to his move to Illinois.

5. See, Commonwealth v. Leaming, 432 Pa. 326, 247 A.2d 590 (1968).

Chancellor on the grounds that appellant lacked standing to attack the search of the Gilkey property. The suppression court's written opinion further stated that even if Treftz did have standing, "we do not believe that the search and seizure in this case was an unreasonable invasion of privacy." We agree.

■■ The law governing standing to attack the validity of a search and seizure has consistently adhered to the principle that constitutional rights under the fourth amendment are personal in nature. *Brown v. United States,* 411 U.S. 223, 230, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Wilcox,* 357 F.Supp. 514, 517 (E.D.Pa.1973); *Commonwealth v. Ross,* 452 Pa. 500, 505, 307 A.2d 898, 900 (1973). A defendant solely aggrieved by virtue of the introduction of damaging evidence will be denied standing. *Alderman v. United States,* 394 U.S. 165, 171, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Jones v. United States,* 362 U.S. 257, 261, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Maroney,* 220 F.Supp. 801, 806 (W.D.Pa.1963); *Commonwealth v. Raymond,* 412 Pa. 194, 201, 194 A.2d 150, 153 (1963).

The United States Supreme Court in *Brown, supra,* has outlined the perimeters of what shall be deemed essential to a finding that the criminal defendant's *own* personal rights lay at the core of the improper and proscribed governmental action, thereby justifying the invocation of the exclusionary rule. In the instant case, appellant Treftz fails to meet any of the *Brown* standards.

■ Under *Brown,* a defendant must allege one of the following "personal" interests in order to establish standing: (1) his presence on the premises at the time of the search and seizure; [6] (2) a possessory interest in

6. As was pointed out in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), however, this must be with the permission of one with a proprietary or possessory interest in same. 362 U.S. at 267, 80 S.Ct. 725.

the evidence improperly seized;[7] (3) that the offense charged include as an essential element of the prosecution's case, the element of possession at the time of the contested search and seizure;[8] or, (4) a proprietory or possessory interest in the searched premises.

In applying the facts of this case to the *Brown* test, the following can briefly be stated: (1) appellant Treftz was residing in Lyndon, Illinois, at the time Pennsylvania State Policemen searched the Gilkey property; (2) appellant has asserted no possessory interest in the corpse of Mark Allen Chancellor (as he obviously would be hard-pressed to logically do); and, (3) possession is not an element, essential or otherwise, of the crimes charged against appellant, the indictment charging him with the crimes of murder, voluntary manslaughter, involuntary manslaughter and criminal conspiracy in connection with the death of Chancellor.

Whether or not appellant Treftz has alleged facts sufficient to confer standing upon him on the basis of his asserting a possessory interest in the premises searched is a more difficult question. The United States Supreme Court has stated that historical property labels such as "invitee" or "guest" are misplaced in this constitutional

7. See, *Commonwealth v. White*, 459 Pa. 84, 89, 327 A.2d 40, 42 (1974), *cert. denied*, 421 U.S. 971, 95 S.Ct. 1967, 44 L.Ed.2d 461.

8. *Jones, supra*, granted what has since been termed "automatic" standing to individuals so charged in order to avoid the dilemma then present which forced a defendant seeking to exclude evidence from trial at his suppression hearing to choose, in essence, between two competing constitutional rights, *e. g.*, the fourth amendment right to be free from unreasonable searches and seizures and the fifth amendment right to abstain from incriminating oneself *with one's own statements*. Subsequently, the United States Supreme Court in *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) resolved this dilemma in deciding that statements made by a criminal defendant at his suppression hearing, offered in order to establish his standing, would not be permitted in use at the main trial by the prosecution. *Brown, supra*, noted that the Court's holding in *Simmons* made *Jones* unnecessary, but the *Brown* Court declined to overrule *Jones*. 411 U.S. at 227–230, 93 S.Ct. 1565.

analysis. *Jones v. United States, supra,* 362 U.S. at 266, 80 S.Ct. 725. Rather, the Court has been concerned with seeking to answer in any given case whether or not the facts are such as to warrant a finding that the defendant had a "reasonable expectation of privacy." "The Fourth Amendment protects *people,* not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

It is not necessary, then, under *Brown,* for appellant Treftz to claim title ownership to the searched property. Certainly John Gilkey would be deemed to have a sufficient possessory interest in the searched premises as to qualify him under *Brown* to attack the constitutionality of the instant search and seizure, although he was without title to the premises, residing there with his family rent-free for approximately fifteen years.

Nevertheless, we believe that the interest appellant Treftz asserts today, that of an occasional and transient visitor to the Gilkey farm house, who last visited the premises three weeks prior to the illegal search, and who had no remaining personal belongings on the property, falls well below the legal standards to justify any reasonable expectations of privacy previously set by this Court as well as those enunciated by the United States Supreme Court.[9]

In *Commonwealth v. Raymond,* 412 Pa. 194, 194 A.2d 150 (1963), the defendant was an occasional over-night guest at the home of his cousin, always sleeping in the same bedroom. Police officers searched this room only two days after the defendant's last visit and found therein incriminating evidence which defense counsel argued should have been excluded from trial on the grounds that the allegedly illegal search violated defendant's fourth amendment rights. In this pre-*Katz* case, our Court held that Raymond lacked standing to contest the search of

**9.** *Cf. Jeffers v. United States,* 342 U.S. 48, 50, 72 S.Ct. 93, 96 L. Ed. 59 (1951).

his cousin's home: "The [defendant] did not reside therein. He did not rent the room involved or have any authority over it, except when he was there. At the time of [sic] search none of his clothing or other property was there. As of that time, he had for all practical purposes 'vacated' it and 'abandoned' the evidence seized. His regular residence was in his mother's house at another address." 412 Pa. at 201, 194 A.2d at 153.

In a subsequent case, *Commonwealth v. Strickland*, 457 Pa. 631, 326 A.2d 379 (1974), this Court applied the appropriate *Katz* analysis and held that a defendant lawfully occupying two residences on more than an occasional basis had a justifiable expectation of privacy in both places protectable under the fourth amendment. The defendant Strickland lived with his mother on the weekends at an address located in one section of Philadelphia but regularly resided at his grandmother's home, the searched premises, during the week in order to be in closer proximity to his place of employment. 457 Pa. at 633, 326 A.2d at 381. The defendant's absence from the searched premises could not be looked upon as an abandonment of any expectation of privacy where such absence was due solely to penal incarceration pending his trial. 457 Pa. at 637, 326 A.2d at 383. Mr. Justice Roberts, writing for the majority, reaffirmed the validity of our *Raymond* decision in noting that the outcome reached in *Strickland* was consistent with the former:

"We held Raymond lacked standing to contest the seizure. The infrequency, irregularity, and brevity of the appellant's visits made any expectation of privacy he might have had clearly unreasonable."

457 Pa. at 636, 326 A.2d at 382.

In *United States v. Wilcox*, 357 F.Supp. 514 (E.D.Pa. 1973), Chief Judge Joseph S. Lord, III, granted the defendant's suppression motion upon a finding that incriminating evidence had been illegally obtained by F.B.I. agents during a warrantless search of the defendant's es-

tranged wife's apartment. While it was admitted that the defendant never lived in that apartment, the district court found that where the defendant had been given a key to the apartment, regularly visiting his children there on weekends and where it was clear that the illegal search was directed against the defendant, "defendant had a sufficient interest in the premises to justify any expectations of privacy which he may have had there and to qualify him as a 'person aggrieved by the search.'" 357 F.Supp. at 518.[10]

Appellant Treftz's irregular and brief visits to the Gilkey farm house, some occasioned, according to his own admissions, by his inability to return home at night due to the lateness of the hour and his inebriated condition, are insufficient to justify his claimed expectation of privacy at the searched premises. Appellant did not have a key to the house. Furthermore, by the time of the search, appellant had absented himself from the premises for over three weeks, taking with him the last of his personal property, e. g., his two motorcycles. Also, with John Gilkey and other Ohio Chapter club members in jail on charges stemming from the Chancellor murder, it was extremely unlikely that another club meeting would be held. By October 26, 1974, Treftz had effectively "abandoned" all cognizable interest in the searched premises making his asserted privacy claim therein unreasonable.[11]

10. *Accord: United States v. Birrell*, 470 F.2d 113 (2d Cir. 1972).

11. Appellant's reliance on this Court's previous holdings in *Commonwealth v. White*, 459 Pa. 84, 327 A.2d 40 (1974) *cert. denied*, 421 U.S. 971, 95 S.Ct. 1967, 44 L.Ed.2d 461 and *Commonwealth v. Weeden*, 457 Pa. 436, 322 A.2d 343 (1974), *cert. denied*, 420 U.S. 937, 95 S.Ct. 1147, 43 L.Ed.2d 414, is misplaced. In *White*, appellee White was in the intensive care unit of a hospital at the time police officers searched his mother's apartment where he had been temporarily staying. Certain of his personal belongings in the apartment were illegally seized by the police who went to the apartment, knowing the appellee to be in the hospital, for the specific purpose of obtaining evidence against White. This Court held that appellee's expectation that those personal possessions would be free from governmental intrusion was reasonable. 459 Pa. at 90, 327 A.2d at 43. "An individual's *effects* and *posses-*

Lastly, it is by no means insignificant to our analysis that the evidence sought to be suppressed, Chancellor's corpse, was discovered in a wooded area 148 yards from the rear fence line which separates the dwelling area, including a cleared yard, from his backwoods area open to hunters. Although the United States Supreme Court decision in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) pre-dated the current legal search and seizure inquiry, *Katz* lent implicit support to the "open fields" doctrine. (*Katz v. United States*, 389 U.S. at 351, fn. 8, 88 S.Ct. 507.) *Hester* announced with reference to the command of the fourth amendment: ". . . the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields." 265 U.S. at 59, 44 S.Ct. at 446.[12]

*sions* are constitutionally protected from unreasonable search and seizure as well as his person. U.S.Const. Amend. IV, Pa.Const. Art. I, 8." 459 Pa. at 88, 327 A.2d at 42.

In *Commonwealth v. Weeden, supra,* the Court's decision to grant standing to appellant to contest the search of a co-defendant's fiancee's apartment rested on the *Jones v. United States, supra,* "automatic standing" doctrine.

12. *Accord: Fullbright v. United States,* 392 F.2d 432, 434 (10th Cir.), *cert. denied,* 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968); *United States v. Campbell,* 395 F.2d 848 (4th Cir.), *cert. denied,* 393 U.S. 834, 89 S.Ct. 106, 21 L.Ed.2d 105 (1968); *United States v. Hollon,* 420 F.2d 302, 303 (5th Cir. 1969). In a Fifth Circuit Court of Appeals decision, *Atwell v. United States,* 414 F. 2d 136 (1969), it was held:

"The record shows that the still in question was located approximately 250 yards from the back of a house in the open land beyond the curtilage of the house. Appellants argue that the Government should have proved that there was not an unlawful search or seizure before being allowed to introduce any testimony regarding what the officers saw at the still site. But inasmuch as the protection of the Fourth Amendment against unreasonable searches and seizures does not extend to 'open fields,' there was no unreasonable search. [Citations omitted]. Moreover, even if the officers were trespassing on private property, a trespass does not of itself constitute an illegal search."

414 F.2d at 138. *Cf. Wattenburg v. United States,* 388 F.2d 853, 856–57 (9th Cir. 1968); *United States v. Resnick,* 455 F.2d 1127, 1132 (5th Cir. 1972).

## II

Appellant Treftz complains that the Commonwealth's evidence against him was merely circumstantial in nature and that the facts adduced at trial could easily support an alternative theory that the deceased was killed and buried on some other date than that testified to by the Commonwealth's chief witness, Mrs. Mary Gilkey.

The law in Pennsylvania has consistently recognized that circumstantial evidence may, without more, be the basis of a conviction so long as the inferences drawn therefrom prove the fact or facts in question beyond a reasonable doubt. *Commonwealth v. Cox,* 460 Pa. 566, 333 A.2d 917, 918 (1975); *Commonwealth v. Chester,* 410 Pa. 45, 188 A.2d 323, 327 (1963). In *Chester, supra,* this Court was confronted with a set of circumstances such that the alternate theory of how the victim might have died posed by the defense was reviewed: "Of course, it is *possible*—although highly improbable—that between 3:00 a.m. and 10:00 a.m. someone else entered [the deceased's] room and beat him. However, the Commonwealth is not required to prove its case with absolute certainly but only beyond a reasonable doubt." *Commonwealth v. Chester,* 410 Pa. at 52, 188 A.2d at 327–28.[13]

In the instant case, a review of the record below leads us to the conclusion that the facts presented at trial by the Commonwealth were such that a jury could properly find beyond a reasonable doubt that the appellant committed the crime charged against him.

## III

Lastly, appellant Treftz requests that this Court order a new trial on the basis of after-discovered evi-

13. Furthermore, it is well-settled that we are to view the evidence in the light most favorable to the Commonwealth as verdict winner. *Commonwealth v. Rankin,* 441 Pa. 401, 404, 272 A. 2d 886 (1971).

dence. The after-discovered evidence tendered is that of a complete and full confession to the murder of Chancellor made by one Frank B. Howell. Appellant was convicted on February 20, 1974. Howell, sought on charges in connection with the Chancellor murder, was not arrested until April of 1974. On July 24, Howell entered a plea of guilty to voluntary manslaughter. On August 14, while incarcerated at the Pittsburgh State Correctional Institution, Howell signed a confession stating that he and a Gary Faust shot and killed Chancellor on the night of October 16, 1974, while at the Gilkey farm house and that they then together buried the victim in the backwoods behind the Gilkey residence.

Howell was also a member of the Ohio Motorcycle Club Chapter. Faust was a member of the Trenton, New Jersey, Chapter. The testimony given by Mr. Howell at the Treftz post-trial hearing was that Howell and Treftz were both incarcerated in the same cell bloc at the time of August 14, 1974. Furthermore, Howell testified that he typed his confession on a typewriter borrowed from appellant Treftz and that the latter addressed and mailed copies of the Howell confession to the district attorney, to Howell's attorney, to his own attorney, to the judge and to others. On cross-examination, Howell admitted that a jailhouse lawyer had advised him of the law on double jeopardy to the effect that although his confession might affect his forthcoming sentencing on the manslaughter plea and that later parole considerations might be affected as well, the Commonwealth would not be able to retry Howell for the murder of Chancellor, having already accepted his plea to voluntary manslaughter.

"In order to justify the grant of a new trial on the basis of after-discovered evidence, the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a

different result: [Citations omitted] . . . ." *Commonwealth v. Schuck*, 401 Pa. 222, 229, 164 A.2d 13, 17 (1960), *cert. denied*, 368 U.S. 884, 82 S.Ct. 138, 7 L.Ed. 2d 188 (1961).

The Commonwealth in this case admits that the evidence offered was not available to appellant at trial nor could it have been obtained by the exercise of due diligence. Howell was still at large and not arrested until after the jury returned its verdict against Treftz. Moreover, it cannot be said that Howell's confession is corroborative or cumulative of anything stated at trial but rather completely contradicts the testimony of Mrs. Mary Gilkey, the Commonwealth's chief witness.[14] Nor is the after-discovered evidence merely offered here to impeach the credibility of Mrs. Gilkey. It is offered as a complete confession.

The trial court refused to grant appellant a new trial on the basis of the Howell confession, however, finding Howell's offer to be "incredible and not of sufficient

---

**14.** Very briefly, Mrs. Gilkey's testimony at trial was that the Ohio "Breed" Chapter held a meeting at her house on the weekend of October 12, 1974. Chancellor was present seeking initiation to the club. Appellant was present as well as was Mrs. Gilkey's husband, John, Frank "Hillbilly" Howell, "Dirty" Gary Faust, and others. Mary Gilkey had been sent to the store to purchase bullets for appellant's .38 caliber pistol. He was the only member with a .38. Although Mrs. Gilkey and the other women and children present on the day of October 13 were not permitted in the kitchen, Mrs. Gilkey testified that she overheard the club members arguing with Chancellor in the kitchen and at one point went into the kitchen following a crashing sound and saw Chancellor lying on the floor, bleeding about the face and head, and she saw a broken chair nearby. Shortly afterwards, she again came into the kitchen and saw Chancellor on the ground outside the back door. She testified that one of the club members said to Chancellor, "You are as good as dead" and challengingly questioned the club president, appellant Treftz, "What are you going to do about it." She saw appellant, gun in hand, follow out to the back porch and moments later heard a shot and then several more shots. She testified that she never saw Chancellor again. The victim's body was recovered October 26, 1974, and one of the things uncovered by the autopsy was a .38 caliber bullet. No other bullets were found remaining in the body although the victim had been shot several times.

trustworthiness to warrant a new trial since *we do not believe it would likely change the verdict.*" (Emphasis added). We find no abuse of discretion in the lower court's refusal to grant a new trial. *See Commonwealth v. Tervalon,* 463 Pa. ——, 345 A.2d 671 (1975) ; *Commonwealth v. Mosteller,* 446 Pa. 83, 89, 284 A.2d 786 (1971).

The lower court's written opinion following the post-trial hearing points out aptly that Howell's confession was not such as to put Howell in a position where, by virtue of his confession, he would incur the risk of further criminal prosecution. Howell knew this following advice from jailhouse counsel on the law of double jeopardy. *See Commonwealth v. Tervalon, supra,* at ——, 345 A.2d at 675, wherein this Court said: ". . . his testimony was not unlike that of 'a co-conspirator who is already in prison and realistically has little to lose by attempting to free his partner', *Commonwealth v. Mosteller, supra* [446 Pa.] at 91, 284 A.2d at 789 which testimony has traditionally been examined and considered with great caution."

Finally, as the lower court's opinion details, Howell's confession is in such form as to precisely respond to "all of the Commonwealth's charges and provides the defendant, Treftz, with an escape from any theory under which the Commonwealth advanced during the trial." The factual particularity referred to, viewed in light of the admitted collaboration between the appellant and Howell in preparing the confession while in prison, justifies the lower court's decision denying a new trial.

Judgment affirmed.

MANDERINO, J., did not participate in the consideration or decision of this case.

ROBERTS and NIX, JJ., concur in the result.