J-S29039-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                   :            PENNSYLVANIA
                                   :
               v.                      :
                                   :
                                   :
WAYNE JOHNSON                   :
                                   :
              Appellant            :      No. 2454 EDA 2019

Appeal from the PCRA Order Entered July 23, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010416-2009

BEFORE: PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                  Filed: August 20, 2020

Wayne Johnson (Johnson) appeals from the order entered in the Court of Common Pleas of Philadelphia County (PCRA court) dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. We affirm.

**I.**

**A.**

On May 27, 2009, around 7:38 p.m., Philadelphia Police Officers Jose Perez and Joseph Pannick were driving when they heard gunshots at an apartment complex two blocks away. Officer Perez, the driver, turned the car and sped toward the gunfire. As the officers approached, two men were

---

[*] Retired Senior Judge assigned to the Superior Court.

standing and pointing guns at Derrick Davis (Davis). Both men were making pumping motions with their arms and Officer Perez could see gunpowder come out of one of the guns. When they saw the police car, the two men fled. Officer Pannick went after and caught one of the men, Robert Harris (Harris), who discarded a handgun while being chased. Officer Perez was unable to catch the other man but identified Johnson later that night in a photo array made by a police imaging machine, realizing he had seen Johnson before in the neighborhood. Davis died because of six gunshot wounds and a warrant was issued for Johnson's arrest.

At the crime scene, the police recovered the handgun discarded by Harris: a Smith & Wesson .40 caliber that was jammed with a double feed. The police also recovered nine fired cartridge casings and a projectile. Significantly, the casings and the projectile were all .45 caliber. A few days after the murder, a Philadelphia mail carrier found a Glock .45 handgun in a mailbox. Ballistics testing was performed to determine if it matched the casings and projectile. While no conclusion could be reached about the projectile, the testing determined that the casings were fired by the Glock .45 handgun.[1]

---

[1] A projectile was also recovered during the autopsy but no determination about its caliber could be made.

The police also obtained outdoor video surveillance footage from the apartment complex. Although it did not show the murder being committed, the surveillance footage showed Johnson and Harris walking together toward where Davis was killed just before it happened. Less than a minute later, the two reappear running away from the police and then splitting up. After eluding Officer Perez, Johnson could be seen tossing away a handgun and then entering an apartment building. A few minutes later, two men retrieved the handgun while talking on their cell phones.

**B.**

A little over a month after the murder, Johnson was apprehended in South Carolina. After waiving his *Miranda* rights, Johnson claimed that he knew nothing about the murder because he left Philadelphia for South Carolina a few days before Memorial Day, which would have been two days before Davis was killed. However, after additional questioning, Johnson admitted he was in a nearby house when the shooting occurred. He nonetheless maintained that he was not involved, insisting that he was inside all day with a toothache and did not go outside to see what was happening when there were gunshots.

In May 2011, Johnson and Harris proceeded to a joint jury trial. Officer Pannick could identify only Harris as one of the two men standing over Davis holding guns. Officer Perez, however, identified both Johnson and Harris, testifying that he got close enough to see Johnson's gun emit gunpowder. A

third eyewitness, Patricia Terry, testified that she was nearby when she heard gunshots. After falling to the ground to cover her grandson, she looked up and saw two men standing over Davis. Besides the eyewitness testimony, the Commonwealth also presented outdoor video surveillance footage from the apartment complex, the ballistics evidence and the audio recording of Johnson's statement after he was arrested.

Johnson and Harris presented defenses claiming that Davis was killed by a man named Allen Dorsey (Dorsey), who was killed in July 2009. Though both conceded being close to the shooting, Johnson and Harris argued that the police chased after them only because they ran away after the shooting. Johnson did not contest that the video surveillance footage showed him tossing away a gun after he eluded Officer Perez, but disputed that his gun was the Glock .45 later discovered in the mailbox.

While neither Johnson nor Harris took the stand, three defense witnesses testified that they saw Dorsey shoot Davis. The first was Eric Williams (Williams). He testified that he was waiting for a bus when he heard gunshots. He then turned and saw Dorsey pointing a gun at Davis on the ground, at which point Williams ran away. The second witness was Lawrence Lewis (Lewis). He testified that he was standing around when Johnson and Harris walked up to him. As the three were talking, Lewis looked down the street and saw Dorsey arguing with Davis. Moments later, Dorsey pulled out a gun and shot Davis. The third witness was Harris's sister, Patricia Harris.

She testified that she was in her apartment when she looked outside and saw Johnson and her brother walking. After hearing a gunshot, she rushed to her window and saw Dorsey shoot Davis in the back, with Johnson and her brother then running back in the direction that they came.

The Commonwealth attacked the witnesses' credibility on two bases. The first was bias. Besides highlighting the potential bias of Patricia Harris for her brother, the Commonwealth questioned Williams and Lewis about their relationships with the defendants. Williams admitted that he was childhood friends with the defendants and grew up in the same neighborhood as them. Similarly, though he was older than the defendants, Lewis testified that he has known them both since they were young and growing up in the same neighborhood, estimating that he has known them for over ten years.

The second attack was that the witnesses waited until trial to come forward and claim that they saw Dorsey shoot Davis. Williams said that he was scared to come forward initially, but still did not want to get involved even after learning that the defendants were charged with murder. Lewis did not contact the police because he assumed the video surveillance footage showed that Dorsey killed Davis. After learning that the defendants were charged, Lewis claimed that he spoke to Harris's first attorney about giving a statement. After that, however, he heard nothing further until Harris's second attorney contacted him a few weeks before trial. Lewis also claimed that, despite Dorsey being killed in July 2009, he was scared to come forward out of fear

for his family's safety. Finally, Patricia Harris testified that she knew her brother was arrested but did not learn that he was charged with murder until she went to his preliminary hearing. At that point, she figured giving a statement would be futile because it would be her word against the police, not to mention she was scared of retaliation for cooperating. Similar to Lewis, she claimed that her brother's first attorney told her an investigator would interview her but heard nothing further until his second attorney contacted her just before trial.

At the conclusion of the trial, Johnson was convicted of first-degree murder and sentenced to life imprisonment.[2] The jury, however, acquitted Harris of murder and conspiracy but could not reach a verdict on the remaining firearms charges. In November 2011, he entered into a negotiated guilty plea agreement on those charges and was sentenced to 11½ to 23 months' imprisonment followed by five years' probation.[3]

_____

[2] Johnson was also convicted of possessing an instrument of crime, carrying a firearm without a license and carrying a firearm on a public street in Philadelphia. He was found not guilty of conspiracy to commit murder.

[3] Harris pled guilty to firearms not to be carried without a license and carrying a firearm on public streets in Philadelphia; the Commonwealth dismissed possession of an instrument of crime. In December 2012, Harris was resentenced on a probation violation. When his counsel failed to file a direct appeal, Harris filed a PCRA petition that languished for several years. After his appeal rights were reinstated, we affirmed the resentencing. *Commonwealth v. Harris*, No. 723 EDA 2018 (Pa. Super. December 30, 2019) (unpublished memorandum).

After the denial of his post-sentence motion, Johnson filed a direct appeal to raise a jury instruction claim. We affirmed the judgment of sentence and our Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Johnson*, No. 2662 EDA 2011 (Pa. Super. April 4, 2013), *appeal denied*, 74 A.3d 1030 (table) (Pa. September 12, 2013). Johnson did not seek *certiorari* in the Supreme Court.

## II.

Johnson's PCRA petition began its tortuous path on April 1, 2014, when he filed a *pro se* petition requesting counsel, which the PCRA court appointed a few months later. In March 2015, Johnson filed a *pro se* supplement asserting that he sent his counsel an affidavit from his co-defendant Harris. That affidavit, which was dated December 15, 2014, read as follows:

> I was walking to see my sister to give her some money for my nephew[.] I [saw Johnson]. He asked me where I was going[.] I told him my sister['s] house[.] He said cool[,] he was going that way too to Sneakervilla to buy a hat[.] As we got in front of my sister['s] door we [saw] a few of our friends standing around[.] As we got closer I noticed Allen [Dorsey] and [Derrick Davis] in a heated argument[.] Allen [Dorsey] pulled a gun out and shot [Davis][.] [Davis] started to run[.] Allen [Dorsey] ran after him and kept shooting him[.] The crowd came[.] I ran[.] [Johnson] ran[.] I got stopped by the cops[.] They arrested me for having a gun on me[.] I don't know where [Johnson] went[.] I think he ran home[.] I know I [saw] Allen [Dorsey] shoot [Davis] for sure.

When there was no progress on Johnson's petition, the PCRA court appointed new counsel, and when there were no new developments for several months, Johnson asked permission to proceed *pro se*. In April 2017, the PCRA court relieved counsel and appointed Johnson his third PCRA counsel. On July

12, 2018, PCRA counsel filed an amended petition raising a single after-discovered evidence claim under 42 Pa.C.S. § 9543(a)(2)(vi) based on Harris's affidavit that he saw Dorsey shoot Davis.

On March 8, 2019, the PCRA court stated on the record its intent to dismiss the petition without hearing. Finding that Harris's testimony would be cumulative of the three defense witnesses who testified at trial, the PCRA court explained:

> Exculpatory accomplice evidence should be viewed with suspicion, especially where the accomplice has already been tried and has nothing to lose.
>
> [Harris's] testimony will be cumulative as its substance was already presented to the jury three Defense witnesses at trial[:] Eric Williams, Lawrence Lewis and Patricia Harris.
>
> All three individuals testified that Allen Dorsey shot and killed [Davis]. None of these witnesses were impeached with *crimen falsi*. Instead, the Commonwealth showed that the witnesses were biased and had motive to lie due to their close relationships with [Johnson] and with [Harris] because [Johnson] and [Harris] had a close relationship. Patricia Harris was [Harris's] sister and the other two males were close friends of [Johnson] and [Harris].
>
> Therefore, Harris['s] testimony would constitute that of a fourth witness who not only had bias toward all of the other parties involved in the case because of the close relationship but also who was a codefendant, who, essentially, was not found guilty of murder, already pled to only weapons offenses, could not be tried again and had nothing to lose. Therefore, the testimony of Mr. Harris would have the added detriment of being viewed with a jaundice eye.

N.T., 3/8/19, at 11-12.

Even if not cumulative, the PCRA court went on to find that the testimony would not change the outcome of the trial:

> The jury heard from two police officer eyewitnesses, one of them knew [Johnson] from the neighborhood and saw him from 12 feet away, in broad daylight, holding a smoking gun, over [Davis], who was laying there, with six gunshot wounds.
>
> There was also video and an additional eyewitness and the importance of that eyewitness, Patricia Terry, is that her testimony [was] that there were two persons, two males, standing, shooting over the individual on the ground and the testimony by Mr. Harris would be that there was one person and that that was this person named Allen Dorsey.
>
> So his testimony wouldn't comport with the video and the eyewitness evidence. Therefore, his testimony certainly would not have changed the outcome or would not likely compel a different verdict in this case.

*Id*. at 12-13.

After Johnson responded, the PCRA court entered an order dismissing the petition on April 11, 2019. Because Johnson apparently never received the order, the PCRA court reissued it on July 23, 2019, and appointed Johnson new counsel to file a notice of appeal, which he did on August 22, 2019.[4] On appeal, Johnson raises a single issue: whether the PCRA court erred in dismissing his petition without an evidentiary hearing because he raised a

---

[4] Johnson also filed a *pro se* notice of appeal that was docketed at No. 2339 EDA 2019 and later dismissed as duplicative.

meritorious after-discovered evidence claim based on his co-defendant Harris's affidavit.[5]

## III.

A PCRA petitioner asserting an after-discovered evidence claim must plead and prove "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). A petitioner seeking relief on this basis must show that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

---

[5] Our standard of review of the denial of PCRA relief without hearing is as follows:

> The standard of review of an order dismissing a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. Further, a PCRA court has discretion to dismiss a PCRA petition without a hearing if the court is satisfied that there are no genuine issues concerning any material fact; that the defendant is not entitled to post-conviction collateral relief; and that no legitimate purpose would be served by further proceedings.

***Commonwealth v. Cruz***, 223 A.3d 274, 277 (Pa. Super. 2019) (citations and quotation marks omitted).

***Commonwealth v. Williams***, 215 A.3d 1019, 1024 (Pa. Super. 2019) (citation omitted). Because this test is conjunctive, a petitioner's failure to establish one prong by a preponderance of the evidence obviates the need to examine the remaining ones. ***Commonwealth v. Solano***, 129 A.3d 1156, 1180 (Pa. Super. 2015) (citation omitted).

The Commonwealth does not contest the first and third prongs. Because Harris was a co-defendant and invoked his Fifth Amendment right against self-incrimination at trial, he was unavailable to testify and did not become available until he pled guilty on the remaining firearms charges. ***See Commonwealth v. Fiore***, 780 A.2d 704, 711 (Pa. Super. 2001) ("A witness's invocation of his Fifth Amendment rights renders him unavailable."). Further, because he is claiming that he witnessed the murder, Harris would not be used solely to impeach the credibility of another witness.

We now turn to the second element: whether the evidence is "merely corroborative or cumulative" of other evidence adduced at trial.

**A.**

To be more than "merely corroborative or cumulative," our Supreme Court has instructed that the evidence must be "of a different and higher grade or character, though upon the same point, or of the same grade or character on a different point[.]" ***Commonwealth v. Small***, 189 A.3d 961, 974 (Pa. 2018) (internal quotations omitted). If, however, the after-discovered

- 11 -

evidence "is of the same character and to the same material point as evidence already adduced at trial," then it will not support the grant of a new trial. *Id*.

Johnson argues that Harris's testimony, though corroborative of his claim at trial that Dorsey killed Davis, would be of a different or higher grade and, therefore, more credible than that given by the three defense witnesses at trial. He emphasizes that the Commonwealth attacked the credibility of each defense witness for waiting until trial to claim that they saw Dorsey shoot Davis. According to Johnson, unlike those witnesses, Harris has an "unassailable explanation" for not coming forward: he was a co-defendant and invoked his Fifth Amendment right against self-incrimination. He further contends that Harris's testimony has added credibility because the Commonwealth's own testimonial and video surveillance evidence established that Harris was at the apartment complex when the shooting occurred.

The Commonwealth counters that though Harris was a co-defendant and not obligated to testify at the trial, Harris waited until December 2014 to give his affidavit claiming that he saw Dorsey shoot Davis. Because he pled guilty and was sentenced in November 2011 on his remaining charges, Harris waited over three years before coming forward, a delay which Johnson fails to explain in his amended petition. Based on this delay, the Commonwealth contends that Harris's credibility would be subject to the same attack as that of the three defense witnesses.

First, Johnson's argument ignores one of the main reasons the PCRA court gave for dismissing his claim: an affidavit submitted by a co-defendant, particularly after the co-defendant has been convicted and sentenced, have long been recognized as being "notoriously unreliable." *Commonwealth v. Washington*, 927 A.2d 586, 597 (Pa. 2007) (PCRA court properly rejected co-defendant's confession as lacking credibility when co-defendant had already been convicted of murder and had nothing to lose by testifying); *see also Commonwealth v. Frey*, 517 A.2d 1265, 1268-69 (Pa. 1986) (finding that statement by co-defendant after he had been sentenced for his participation in the crime "raises a significant question as to its reliability"); *Commonwealth v. Treftz*, 351 A.2d 265, 272-73 (Pa. 1976) (rejecting after-discovered evidence claim based on co-conspirator's confession that would have exonerated defendant where co-conspirator learned he could not be retried because of double jeopardy).

Here, as the PCRA court observed, Harris was acquitted of murder and conspiracy at the trial and then pled guilty and was sentenced on the remaining firearms charges in November 2011. This being the case, there is no disincentive for him to claim that Dorsey shot Davis because he is under no threat of further prosecution. As an initial matter then, the PCRA court was correct to view the reliability of the affidavit by Harris, an acquitted co-defendant, with skepticism.

**B.**

Next, Johnson overestimates the credibility that would attach to Harris's testimony by informing the jury the reason why he could not come forward, especially since he waited over three years before doing so. Johnson believes that Harris would have a sound explanation for not coming forward at trial, since he was also accused of murder and exercised his Fifth Amendment right against self-incrimination. However, this explanation would apply only up to when Harris disposed of his case by pleading guilty and being sentenced on the remaining charges. Because he did not file a direct appeal of his guilty plea and sentence, Harris became available as a witness in November 2011. Despite this, it was not until December 2014—over three years later—when Harris finally came forward and gave an affidavit claiming that he was with Johnson when he saw Dorsey shoot Davis. Consequently, the Commonwealth is correct that Harris's credibility could be attacked just the same as all three defense witnesses were for waiting to come forward.

Harris's delay is also particularly damaging because his affidavit merely reiterates the same version of events that Johnson argued at trial; namely, that he and Harris were near the shooting when it occurred and then ran away. Harris's affidavit is not after-discovered evidence in the sense that it contains information that Johnson did not know; instead, it merely contains information that, if true, Johnson would have known since the murder because Harris is claiming that he was with Johnson when he saw the murder committed.

Importantly, Johnson's amended petition contains no averments explaining why it took over three years for Harris to give his affidavit, averring merely that Johnson "came into possession" of it. Amended PCRA Petition, 7/12/18, at Paragraph 10.

Without any explanation for this three-year delay, any credibility gained by informing the jury that Harris was a co-defendant at the first trial would be negated—if not overwhelmed—by the Commonwealth showing that he is an acquitted co-defendant who waited over three years before coming forward. We cannot conclude, as Johnson urges, that Harris's testimony would be of a higher grade or character than the three defense witnesses. Accordingly, we agree with the PCRA court's assessment that Harris would be a cumulative witness.

**C.**

Even if Harris's testimony was not cumulative, we agree with the PCRA court that it would not likely result in a different verdict if a new trial were held. Before granting a new trial based on after-discovered evidence, "a court must assess whether the alleged after-discovered evidence is of such a nature and character that it would likely compel a different verdict if a new trial is granted." **Commonwealth v. Padillas**, 997 A.2d 356, 365 (Pa. Super. 2010). "In making this determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the

evidence, and the overall strength of the evidence supporting the conviction."
*Id*.

At trial, Officer Perez testified that he saw Johnson standing over Davis as he lay prone on the ground. N.T., 5/12/11, at 13. As he got closer, Officer Perez saw Johnson make a pumping motion while holding the gun, getting close enough to see Johnson's gun actually discharge gunpowder. *Id*. Besides Officer Perez, the Commonwealth presented two eyewitnesses to corroborate that two men were involved in the shooting and refute the defense's claim that Dorsey acted alone. While Officer Pannick could identify only Harris, his testimony echoed that of Officer Perez that there were two men standing over Davis on the ground. N.T., 5/11/12, at 54. Both men, he testified, had guns pointed at Davis and both were making firing motions with their arms. *Id*. at 60-61. Patricia Terry further corroborated that there were two shooters. After the shooting, she gave a statement to police that she saw two men shooting at the man on the ground. *Id*. at 126. Notably, as the PCRA court noted, Patricia Terry was an independent eyewitness with no apparent bias in favor of any of the persons involved.

That the jury acquitted Harris of murder and conspiracy need not, for our purposes, be interpreted as a rejection of the eyewitness evidence that two men—Johnson and Harris—were involved in the murder. Generally, as our Supreme Court has explained, inconsistent verdicts "are allowed to stand so long as the evidence is sufficient to support the conviction."

*Commonwealth v. Miller*, 35 A.3d 1206, 1208 (Pa. 2012) (citations omitted). A court should not speculate on whether the verdicts were a "result of mistake, compromise, lenity, or any other factor." *Id.* at 1213. Moreover, "an acquittal cannot be interpreted as a specific finding in relation to some of the evidence, and ... even where two verdicts are logically inconsistent, such inconsistency alone cannot be grounds for a new trial or for reversal." *Id.* This is particularly so in this case where the Commonwealth's own evidence was that Harris's gun, the Smith & Wesson .40 caliber recovered at the murder scene, was never fired due to a double feed, which was consistent with the police recovering only .45 caliber ballistics at the murder scene.

The Commonwealth's version of events was also reinforced by the video surveillance footage showing Johnson and Harris walking together toward the scene of the murder and then running away from the police less than a minute later. That Johnson incorporated the video surveillance footage into his theory of his defense does not diminish its inculpatory value in showing Johnson walk toward where Davis was shot; run from and elude Officer Perez; discard a handgun; and then have two men come to retrieve the gun minutes later. Additionally, Johnson's post-arrest statement had inculpatory value. In that statement, not only did Johnson begin by lying about being in Philadelphia when the murder occurred, but he continued to lie even after admitting that he was nearby when the shooting happened, claiming that he was inside all

day with a toothache—a claim directly contradicted by the video surveillance footage and his own defense theory.

Against all this evidence supporting guilt, Johnson argues that the verdict would likely be different at a new trial if he were permitted to present the testimony of his co-defendant Harris. As noted above, in determining whether allegedly after-discovered evidence warrants a new trial, the PCRA court considers the integrity of the evidence along with the motive of the witness offering the evidence. **Padillas**, **supra**. Here, Harris's testimony would be an acquitted co-defendant who waited over three years before finally providing an affidavit. Additionally, no less than three witnesses testified for the defense at the trial for the very same claim. Despite each witness explaining why they did not come forward until trial, the jury still credited Officer Perez's testimony over the witnesses and found beyond a reasonable doubt that Johnson shot and killed Davis. It is difficult to imagine that the testimony of a fourth witness, let alone that of an acquitted co-defendant, would result in a jury reaching a different verdict.

Accordingly, we find that the PCRA court correctly concluded that the alleged after-discovered evidence would not result in a different outcome if presented at a new trial.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/20/20</u>