392 A.2d 1301

**COMMONWEALTH of Pennsylvania**

v.

**Bruce A. LATSHAW, Appellant.**

Supreme Court of Pennsylvania.

Argued April 4, 1978.

Decided Oct. 5, 1978.

300

William F. Donovan, State College, for appellant.

C. Kent Price, Asst. Dist. Atty., State College, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

NIX, Justice.

We granted an appeal in this matter from an order of the Superior Court at 242 Pa.Super. 233, 363 A.2d 1246 (1976), affirming a judgment of sentence based upon evidence which appellant contends was obtained as a result of an unlawful search and seizure. The pivotal question is whether appellant had a reasonable expectation of privacy with respect to the contents of certain closed containers stored inside a barn with the consent of the owner's relative who had a limited right to the use of the barn, where the owner of the barn neither knew nor specifically consented to the storage of such containers. For reasons following, we find that appellant had no reasonable expectation that the contents of the closed boxes and footlockers would not be open to inspection and that the owner of the premises had authority to consent to a search of the closed containers. The order of the Superior Court is hereby affirmed.

In reviewing a suppression court's findings, this Court will consider the evidence of the Commonwealth and so much of the evidence for the defense as, fairly read in the

context of the record as a whole, remains uncontradicted. *Commonwealth v. Silo,* 480 Pa. 15, 18, 389 A.2d 62, 63 (1978), citing *Commonwealth v. Harris,* 479 Pa. 131, 136, 387 A.2d 869, 872 (1978). The court below summarized the testimony as follows:

"Minnie Bubb was the sole owner of a set of farm buildings which were not used as part of a farming operation. The buildings consisted of a large two-story farmhouse, a woodshed, a shanty, and a large barn, the latter located some 25–30 yards distance from the house. Her niece was married to Robert Hinds, and she rented to Mr. and Mrs. Hinds the one side of the farmhouse for $100 per month, which included utilities. Minnie Bubb resided in the remainder of the farmhouse.

Minnie Bubb never at anytime made any lease, either oral or written, with respect to the barn or any of the out-buildings, but she did from time to time grant permission for relatives to store articles and to utilize lower portions of the barn. Mrs. Hinds kept a horse in the barn prior to her marriage, and, following her marriage, they kept a goat there and parked their car under the barn. Minnie Bubb also gave permission to a brother to store his tractor, lumber, and a lawn mower in the barn, and allowed him to park his truck outside the barn. She never at anytime gave permission to anyone to use the loft, the haymow, or the upper portion of the barn.

Robert Hinds was a friend of the defendant, Bruce Latshaw. Without knowledge, permission or consent of Minnie Bubb, Robert Hinds gave permission to Bruce Latshaw to store and process shipments of marijuana in the hayloft of the barn for $75.00 a shipment. The presence of the defendant and his co-conspirators was explained to Ms. Bubb by informing her that they were college students who were planting a garden and were doing something for a term paper, and that their presence was necessary as a college requirement.

A week before the search and seizure occurred, Minnie Bubb noticed on her brother's truck, parked outside of the

barn, greenish material resembling weeds, which she *suspicioned* [sic.] to be marijuana. She discussed it with her brother and then called in her sister-in-law, Dora Bubb, who climbed into the loft and discovered a brown paper bag which further confirmed their suspicions, and they then called the police to investigate. Not only did Minnie Bubb give permission to the police authorities to search the area, she actually called them and invited them to do so. The police search which followed uncovered 76 pounds of cured marijuana in bags, cartons and footlockers and, in addition thereto, the police discovered dust masks, a 100-lb. hanging scale, a pair of shears, nets for drying marijuana, a pair of binoculars, masking tape, cord and other processing equipment."

The Fourth Amendment does not preclude a warrantless search of property when consent is given by a person possessing the authority to consent to such search. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); *Commonwealth v. Kontos,* 442 Pa. 343, 276 A.2d 830 (1971); *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973); *Commonwealth v. Storck,* 442 Pa. 197, 275 A.2d 362 (1971). There is no question that Ms. Bubb's consent was voluntarily given and unlike many situations arising in this area, here the police did not seek the permission to search. Thus, the present case is distinguishable from cases in which the government initiated the search, and cases in which there was an element of governmental coercion in obtaining the alleged consent. *See Bumper v. North Carolina, supra; Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921).

■ At the outset we note that the standing of appellant to contest the validity of the search has been conceded by the appellee. Since the offense charged included as an essential element, the possession of the seized articles at the time of the challenged search, the concession of this point was indeed appropriate. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Commonwealth v. Treftz,* 465 Pa. 614, 351 A.2d 265 (1976).

■ Under the facts of this case, Ms. Bubb's control of the barn cannot be seriously questioned.[1] Nevertheless, appellant argues that since Ms. Bubb's *actual* use of the premises was limited and infrequent, she lost the interest which would permit her to give a valid consent for its search. Custody over and control of a building and its contents is not lost merely because the owner has made only infrequent use of the property where the owner has clearly retained the right of access to and use thereof. *See United States v. Cook,* 530 F.2d 145 (7th Cir. 1976). At all times Ms. Bubb made evident her intention of retaining all of the indicia of ownership. Mr. Hinds' use of the barn, and that of the other family members, was gratuitous and not pursuant to any type of lease arrangement. Moreover, the permitted uses were not of a general nature but rather explicitly limited. For example, prior to her marriage, Mrs. Hinds was permitted to keep a horse in the barn and after her marriage, she and her husband were allowed to keep a goat and to park their car under the barn. Ms. Bubb allowed her brother to store his tractor, lumber and a lawn mower in the barn. The suppression court found that she did not at any time give permission to anyone to use the loft, the haymow, or the upper portion of the structure. The particularity with which the owner saw fit to grant to others the right to use her property reinforced her control over the property rather than creating an inference of an intention to relinquish that control.

1. The dissenters in the Superior Court readily admitted Ms. Bubb's right to authorize a search of the barn. *Commonwealth v. Latshaw,* 242 Pa.Super. 233, 237, 363 A.2d 1246, 1248 (1976).

The only serious question presented is whether Ms. Bubb's control over her property vested her with the right to authorize police officials, without a warrant to open and examine the contents of the sealed cartons and locked footlocker that had been placed thereon by another. The answer to this question rests upon a determination as to whether the owner of these containers had a reasonable expectation of privacy as to their contents. The decisions of the United States Supreme Court bearing upon the need to obtain a warrant to authorize a search have been far from consistent, as even the most cursory review makes evident. There has been language which would suggest that the test is not whether the search was reasonable but rather whether it would have been unreasonable to have required the governmental agency to procure a search warrant before making it. *See e. g. United States v. U. S. Dist. Ct.*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Chimel v. Calif.*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). However, the prevailing opinions in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) appear to focus upon the reasonableness of the search. Furthermore, it has been indicated that a warrantless search is per se unreasonable under the Fourth Amendment. *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.E.2d 706 (1973); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[2] However, exceptions under the umbrella of exigent circumstances have been well established.[3]

**2.** Recently, in the decision in *Mincy v. Ariz.*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (decided June 21, 1978), the United States Supreme Court reaffirmed the *Katz* view that warrantless searches are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Id.* at 390, 98 S.Ct. at 2412.

**3.** "Exigent circumstances" is a generic term encompassing numerous examples where it would be unreasonable to require law enforcement agencies to obtain a search warrant prior to effecting a search. Thus, warrants have not been required under the following circumstances: a search incident to a lawful arrest, *United States v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); hot pursuit of a fleeing felon, *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); emergency requiring the need for immediate action to prevent destruction of evidence, *Schmerber v. California*,

■ In any event the third party consent exception to the warrant requirement is firmly established. *South Dakota v. Opperman, supra; U. S. v. Matlock, supra; Schneckloth v. Bustamonte, supra; Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). The basis for the principle that the consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared, is discussed at length in *United States v. Matlock, supra.* In *Matlock,* the Court focused upon the joint access or control, "so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others assume the risk that one of their number might permit the common area to be searched." Id. 415 U.S. at 171, n.7, 94 S.Ct. at 993.

A close reading of the above quoted language from *Matlock* indicates that the test is not based merely on appellant's subjective expectation of privacy, but rests also on a finding that said expectation was reasonable. In determining what is "reasonable" all the surrounding facts and circumstances must be considered.[4] Here, appellant's purported expecta-

384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); and emergency requiring the need for immediate action to prevent evidence, which is easily moveable, from being quickly removed from the jurisdiction, *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

4. See *South Dakota v. Opperman,* 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The most familiar expression of a reasonable expectation of privacy, i. e., one which is entitled to protection under the Fourth Amendment, is the test suggested by Mr. Justice Harlan. See *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring):

"As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule that has emerged from prior decisions is that there is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to

tion of privacy is greatly limited by the legitimate interest of Minnie Bubb in the subject property. Accordingly, what distinguishes the present case from other cases which concern the issue of the ability of a third party to consent to a search of the property or effects of another party is the utter lack of any consensual relationship between Ms. Bubb and the appellant, coupled with the inescapable fact that Ms. Bubb at no time surrendered any indicia of her absolute control over the barn. Relinquishment of this control cannot be implied from mere sporadic permission granted by Ms. Bubb to her tenant and various others for specific uses. As the undisputed owner of the barn, Ms. Bubb had the unimpeded ability to act at will with regard to the contents of the barn. Absent any express or implied consensual understanding with Ms. Bubb, the appellant had no expectation of privacy with regard to the boxes or their contents placed therein. Ms. Bubb's rights thus were superior to the appellant's rights in the barn and its contents. Appellant could not force Ms. Bubb to permit the property to remain in the barn, nor could he impose upon her any custodial duty to protect or otherwise harbor the property.

The record does not reflect what representations Mr. Hinds might have made with reference to his control over the barn.

Nevertheless, while these statements may have been such as to provide a basis for a reasonable subjective expectation of privacy, based upon the facts as they actually existed, the expectation could not be deemed to have been reasonable. The right of an owner of property to request the police to open and examine closed containers upon finding the objects upon her property, which were placed there without her knowledge or consent, particularly where she had reason to believe that they might contain contra-

> keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Id.* at 361, 88 S.Ct. at 516.

band,[5] is indisputable. The fact that Hinds' statements may have been misleading does not vest a constitutional protection in a situation where it obviously would not otherwise exist. The independent right of Ms. Bubb to authorize the search of her property and all items thereon could under no theory have been affected by any representations made by Mr. Hinds to appellant. We therefore hold that the instant search did not violate appellant's right to be free from unreasonable search and seizure.

Order of the Superior Court is affirmed.

POMEROY, J., concurred in the result.

ROBERTS, J., filed a dissenting opinion in which O'BRIEN and MANDERINO, JJ., joined.

MANDERINO, J., filed a dissenting opinion.

ROBERTS, Justice, dissenting.

The majority concludes that State Police officers lawfully opened, searched, and seized appellant Bruce Latshaw's closed boxes and footlockers and their contents, even though no magistrate ever made an independent determination that probable cause supported the governmental intrusion. The majority justifies today's exception from the well-settled warrant requirement of both the federal and Pennsylvania Constitutions on the theory that Minnie Bubb, owner of the barn in which the closed boxes and footlockers were found, but not the owner of these storage containers, could "consent" to the officers' opening of the containers. I dissent.

Minnie Bubb called police to investigate the possibility that marijuana was being stored on her premises. After police arrived at the farm, she gave the officers a plastic bag containing a substance resembling marijuana. Bubb had

5. There have been several circuit court decisions suggesting that a search authorized by a third party, who has a legitimate interest in exculpating himself or herself from possible criminal involvement with the suspected contraband, is not an unreasonable search under the Fourth Amendment. See *United States v. Diggs,* 544 F.2d 116 (3rd Cir. 1976); *United States v. Botsch,* 364 F.2d 542 (2nd Cir. 1966). This theory would also justify the result we reach today.

found the substance in the hayloft of her barn. With the help of Bubb, the officers found the closed boxes and footlockers in the hayloft. With her permission they opened them. Five days later, police arrested Robert Hinds and charged him with possession of marijuana. Hinds and his wife, Bubb's niece, lived on the farm, renting and sharing with Bubb the nearby farmhouse. Police then arrested appellant Bruce Latshaw. Appellant had stored the closed boxes and footlockers pursuant to an agreement with Hinds, who Bubb permitted to store articles in the barn.

Even were it assumed, as the majority concludes, that appellant could harbor no reasonable expectation that persons with lawful access to the barn would not visit the hayloft, it cannot be concluded that the officers' warrantless opening of appellant's storage containers was lawful. Nothing in the record demonstrates that Minnie Bubb, or any other person, shared access to appellant's closed storage containers. Indeed, Minnie Bubb placed the officers on clear, unmistakable notice that she had no interest in the storage containers. Thus, while appellant might have risked that persons with lawful access to the barn would find and view his storage containers, he did not in any respect give up the privacy interest manifested upon closing the boxes and footlockers to the outside world.

*United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), dispels any doubt concerning the reasonableness of appellant's expectation of privacy in his closed boxes and footlockers he stored in Minnie Bubb's barn. There, federal narcotics agents without a warrant opened a footlocker the respondents were publicly transporting. Mr. Chief Justice Burger, speaking for the Court, invalidated the warrantless governmental intrusion. He stated:

"By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amend-

ment Warrant Clause. There being no exigency, it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides." Id., 433 U.S. at 11, 97 S.Ct. at 2483. The Court rejected any notion that respondents' public exposure of the footlockers vitiated the reasonableness of respondents' expectation of privacy. "[T]he Fourth Amendment 'protects people, not places,' *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); more particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. at 7, 97 S.Ct. at 2481.

*Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), compels the conclusion that the officers' warrantless opening of the closed storage containers violated the fourth amendment and the Pennsylvania Constitution. In *Platou,* police had a valid warrant authorizing the search of the apartment of Robert Wander. Upon executing the warrant, the officers found suitcases belonging to Platou. Even though the warrant did not authorize a search of the suitcases, and even though Platou informed the officers that the suitcases were his, the officers searched their contents. In invalidating the search of Platou's suitcases, this Court concluded:

"The Fourth Amendment guarantees that '[t]he right of the people to secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .' [*] A person does not lose the protection of the Fourth Amendment by entering the apartment of another. *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *Jones v.*

* [Footnote 11 in original]  " 'The wording of article I, section 8 of the Pennsylvania Constitution is only slightly different. "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures . . . ." ' "  In note 2 of *Platou,* 455 Pa. at 260 n. 2, 312 A.2d at 31 n. 2, we stated: "Our discussion of the Fourth Amendment is equally applicable to the state constitutional provisions."  See *Pennsylvania v. Platou,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974) (Supreme Court of the United States denying certiorari, "it appearing that the judgment below rests upon an adequate state ground").

*United States,* 362 U.S. 257, 261–67, 80 S.Ct. 725, 731–34, 4 L.Ed.2d 697 (1960); *Reece,* supra. Neither do a person's effects. The Fourth Amendment permits no lesser protection for a person's effects, than for his person. So long as a person seeks to preserve his effects as private, even if they are accessible to the public or to others, they are constitutionally protected. *Katz,* supra at 351, 88 S.Ct. at 511. Stated differently, a person must maintain the privacy of his possessions in such a fashion that his 'expectations of freedom from intrusion are recognized as reasonable.' *Id.* at 361, 88 S.Ct. at 517 (HARLAN, J., concurring).

Personal belongings brought by their owner on a visit to a friend's house retain their constitutional protection until their owner meaningfully abdicates control or responsibility. Appellant's placing his suitcases on the floor of Wander's apartment and opening one of them does not amount to an abandonment of his control. Appellant maintained his reasonable expectation of privacy. And therefore the search of his suitcases was unreasonable and constitutionally impermissible."

Id., 455 Pa. at 266–67, 312 A.2d at 34 (footnote renumbered).

Both here and in *Platou,* the officers may have lawfully been in a position to observe persons' effects. But in both instances neither person subjected to the warrantless governmental intrusion relinquished any reasonable expectation of privacy in their belongings. In examining Platou's personal effects, police were fully aware they were exceeding the scope of their warrant to search Robert Wander's premises. So too here, the officers knew that Bubb had no control over the contents of the closed cartons. She expressly disavowed their ownership, the storage containers were located in a place where property is not likely to be abandoned, and Bubb made no claim to exclusive control of the barn. No less than in *Platou,* appellant's reasonable expectation of privacy must prevail.

The majority never addresses whether its conclusion is consistent with *Platou,* even though appellant argues that *Platou* is controlling. Moreover, the majority ignores *Chad-*

*wick.* Also ignored by the majority is *Commonwealth v. Silo,* 480 Pa. 15, 389 A.2d 62 (1978). There, a hospital nurse, upon the request of police officers, took the personal effects of Jerome Silo from the hospital in which Silo was located and turned them over to police. In invalidating this warrantless police seizure, this Court unanimously concluded:

> "[T]he narrow issue in the instant case is whether it can be said that the nurse had mutual use and joint access or control over appellant's clothing. The mere statement of the issue suggests the answer. Although it may be conceded *arguendo* that the nurse had joint access and control to appellant's clothing, there was clearly no right to mutual use of the clothing by the nurse or any other member of the hospital staff. The nurse's access to and control of appellant's clothing were for the purposes of safeguarding these effects, not for the purpose of using them. We therefore reject the argument that the nurse's consent validated the seizure of appellant's clothing."

Id., 480 Pa. at 23, 389 A.2d at 66. Like *Platou* and *Chadwick, Silo* is controlling.

In *Chadwick,* Mr. Chief Justice Burger reaffirmed the role of the warrant in our constitutional scheme:

> "[T]he judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Once a lawful search has begun, it is also far more likely that it will not exceed proper bounds when it is done pursuant to judicial authorization 'particularly describing the place to be searched and the persons or things to be seized.' Further, a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. *Camara v. Municipal Court,* 387 U.S. 523, 532, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967)."

*United States v. Chadwick,* supra 433 U.S. at 9, 97 S.Ct. at 2482. Absent proper consent, it must be concluded that, consistent with *Chadwick, Platou, Silo,* and the established law of search and seizure, state police officers' warrantless opening of appellant's closed boxes and footlockers was unlawful under the fourth amendment and Pennsylvania Constitution.

I would reverse judgment of sentence and grant appellant a new trial.

O'BRIEN and MANDERINO, JJ., join in this dissenting opinion.

MANDERINO, Justice, dissenting.

I join in the dissent of Mr. Justice Roberts but would note further that the majority's analysis seems to be based upon an assumption that it is the property owner's constitutional rights which we are to protect rather than the accused's. To say that the accused who left a closed container in a place where he had permission to do so had no expectation of privacy is absurd. Under the majority's reasoning before one can legitimately expect privacy, they would have to hire an attorney to check deeds and leases before leaving an item in a place when a friend says it's all right to do so. Such a conclusion necessarily follows from the result reached today by the majority.