J-S70032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| FRANK BAILEY, III | : | |
| Appellant | : | No. 117 MDA 2017 |

Appeal from the Judgment of Sentence November 23, 2016
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s):  CP-36-CR-0000296-2016

BEFORE:  GANTMAN, P.J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                                    **FILED MAY 30, 2018**

Frank Bailey, III, appeals from the judgment of sentence imposed November 23, 2016, in the Lancaster County Court of Common Pleas.  On September 27, 2016, a jury convicted Bailey of possession of a firearm by a person not to possess.[1]  The court sentenced Bailey to a term of five to ten years' imprisonment for the conviction.  On appeal, Bailey raises challenges with respect to the admissibility of certain evidence, the denial of his motion to suppress, and the denial of his request for a particular jury instruction.  For the reasons below, we affirm on the basis of the trial court's opinion.

The trial court set forth the factual history as follows:

On November 30, 2015, Officers Michael Neff and Lee Billiter, assigned to the Manheim Township Selective Enforcement

---

[1]  18 Pa.C.S. § 6105(a)(1).

Unit, were investigating a stabbing in which [Bailey] was the victim.  At the time, [Bailey] also had active arrest warrants for violating the conditions of his parole, and his whereabouts were unknown.  In an attempt to uncover more information about the crime, the officers went to the residence of [Bailey]'s girlfriend, Catherine Villanueva.  The officers arrived at Ms. Villanueva's second-floor apartment around nine or ten o'clock at night.  Officer Neff had visited Ms. Villanueva about a month prior to that date to interview her regarding the same investigation.  When the officers arrived, they knocked on the door, and Ms. Villanueva answered it "a few moments later."  She seemed surprised to see the two officers.  Officer Neff then asked her if she remembered him being there previously to talk about [Bailey], and she said that she did.  He then asked her if she would let the officers come in, and she said "yes" or "something to that effect," and allowed the officers to enter the apartment.  The door opened directly into a living room area, and upon entering, the officers remained "just inside the threshold of the door."  The apartment had a living room, a kitchen, and one bedroom.  The bedroom door was closed when the officers arrived.

After entering the apartment, Officer Neff had a "very brief" conversation with Ms. Villanueva, telling her that there were some inconsistencies he wanted to clear up based on his previous interview with her.  Specifically, he asked her if she remembered talking to the officers about "Frank," and whether she had talked to him recently or knew where he was.  Ms. Villanueva responded that she had talked to him to check on his recovery.  During this exchange, Officer Billiter noticed there were "two dinner plates of food sitting out," and based on this observation, stated "something to the effect of, he is here, as in the apartment somewhere."  Officer Neff then asked Ms. Villanueva where [Bailey] was, and she "kind of hung her head and motioned towards the bedroom" by moving her head in that direction.  The two officers then started moving toward the bedroom door, but "before [they] even got to the bedroom, the door opened and Mr. Bailey emerged."[2]

[Bailey] was not living, at the apartment at the time of his arrest, and was not on the lease.[3]  According to Ms. Villanueva's testimony at the suppression hearing[, t]he Friday prior to the arrest, November 27, 2015, she had no contact at all with [Bailey].  However, the following day, Saturday, November 28, 2015, Ms. Villanueva picked [Bailey] up from Elizabethtown after

work, and he stayed at the apartment overnight. On Sunday night, November 29, 2015, Ms. Villanueva brought [Bailey] back to Elizabethtown on her way to work. The Monday after that, November 30, 2015, the day of [Bailey]'s arrest, Ms. Villanueva went to work, went on a date with a different person, and then after a phone call from [Bailey], picked him up again. After stopping at a liquor store, she then brought him back to her apartment.[4] Only she and [Bailey] had access to the bedroom on November 29 and 30.

---

[2] Ms. Villanueva testified that she never consented to the officers entering her apartment, that when they arrived she stepped outside leaving the door open a crack, and they then immediately accused her of lying during their previous visit, and stated that they "had" to come in. After the brief discussion, they entered the apartment without consent and she followed them in. She also stated that the officers were not standing "just inside the door," when they were inside, and that when Officer Billiter said [Bailey] was there, she only looked down, and never gestured toward the bedroom. Ms. Villanueva did not dispute however that [Bailey] then came out of the bedroom before the officers reached the door.

[3] [Bailey] did previously live[] at the apartment for about two and a half months before moving out in August, 2015.

[4] At trial, Ms. Villanueva contradicted this testimony, stating that [Bailey] did not stay overnight that Saturday, bu[t] did stay overnight the Sunday prior to the day of his arrest. Ms. Villanueva also testified at trial that [Bailey] never had access to her car, but was then confronted with her prior inconsistent statement to police. In that statement, Ms. Villanueva stated that [Bailey] did have access to her apartment without her present, and that he had her car "Sunday night about 8:30 to midnight."

---

After [Bailey] exited the bedroom, the officers handcuffed him based on the outstanding warrant. Once handcuffed, [Bailey] was searched, and Officer Neff then asked if there was anything in the bedroom that [Bailey] needed or if there was anything in

there the officers should know about. [Bailey] responded that there was "nothing in the bedroom" and "yelled that [sic] to Ms. Villanueva that this was about him and not about her bedroom and not to let [the officers] go in the bedroom." Officer Neff testified that these comments were directed at Ms. Villanueva, not the officers, and that [Bailey] was looking at her when the statements were made.[5] Officer Neff then took [Bailey] outside to an awaiting patrol car in which he was transported to the police station.[6]

---

[5] Oddly, Ms. Villanueva testified that she did not remember [Bailey] saying anything, nor did she remember any of the officers asking if there was anything in the bedroom they should know about.

[6] In contrast, Ms. Villanueva testified that Officer Billiter told [Bailey] to get down on the ground before arresting him, and that then two additional officers entered the apartment to take him away.

---

When Officer Neff returned, he asked Ms. Villanueva if there was anything in the apartment "that would be trouble for her, drugs, guns, [or] contraband." She responded "not that I know of." Officer Neff was prompted to ask this question because he could see a partially burnt marijuana cigar sitting on the kitchen counter. Officer Billiter then pointed the marijuana out to Ms. Villanueva, and Officer Neff asked for her consent to search the apartment. Ms. Villanueva responded by stating "I don't know why you need to. I don't think there's anything here." In response, Officer Neff again reminded her of the marijuana on the counter, and asked again for her consent to search. Ms. Villanueva then asked what would happen if the officers found something, to which Officer Neff responded that he couldn't say for sure, and that it would depend on what was found. He then asked again for consent, and she said "yes, go ahead, search all you want."[7] When Officer Neff made the requests, he was sitting on the couch next to Ms. Villanueva, he was exhibiting a calm demeanor, and that Ms. Villanueva seemed calm as well. After her verbal consent, Officer Neff wrote up a consent form on a notepad, handed it to her, and she signed it.[8]

After she signed the consent form, the officers searched Ms. Villanueva's bedroom. On top of her five-year-old daughter's bed, they found a Men's size 10 Converse shoe box.[9]  Officer Neff "flipped the shoebox open and saw a beige whitish towel laying inside the shoebox.  [He] lifted it up and out fell a pistol," which became the firearm in question in this case.[10]

_____

[7]   Ms. Villanueva initially testified that she never gave consent to search, but then admitted that she did consent but only after the officers insisted, threatened to call child services, and told her they had probable cause.  She also added that she consented because she had "nothing to hide."

[8] Ms. Villanueva testified that "officer present gave a blank piece of paper and I signed saying consent."

[9] Ms. Villanueva's shoe size is eight and a half.

[10] The pistol was a loaded revolver stamped 1944.

Trial Court Opinion, 4/18/2017, at 1-5 (record citations omitted).

Bailey had a prior criminal record and was not permitted to possess a firearm.  The Commonwealth charged him with possession of a firearm by a person not to possess and possession of marijuana.[2]  Bailey filed a motion to suppress evidence on May 23, 2016.  A hearing was held on September 26, 2016.  The court denied the motion at that time.  The case proceeded to a one-day jury trial on September 27, 2016.  The jury convicted Bailey of

_____

[2]  **See** 35 P.S. § 780-113(a)(31).  The marijuana possession count was dismissed prior to trial.

possession of firearm prohibited. Subsequently, on November 23, 2016, the court sentenced Bailey to a term of five to ten years' incarceration. He did not file a post-sentence motion but did file this direct appeal.[3]

Bailey raises the following issues on appeal:

1. Did the trial court err in denying Mr. Bailey's motion for a mistrial where the Clerk of Courts, while reading into the record Mr. Bailey's prior felony drug convictions for purposes of proving Mr. Bailey was a person[] not to possess a firearm, also read to the jury that Mr. Bailey had a prior firearm charge?

2. Did the trial court err in denying Mr. Bailey's motion to suppress, where police conducted a search of a bedroom in which Mr. Bailey was an overnight guest in when Mr. Bailey denied the officer's request for consent to search?

3. Did the trial court err in denying Mr. Bailey's request for Jury Instruction 16.02(b)(A) to be read to the jury where it would have given the jury a more descriptive definition as to what "possession" meant, and the charge given by the trial court to the jury did not adequately present the law on possession to the jury?

Bailey's Brief at 5.

After a thorough review of the record, the parties' briefs, and the relevant case law, we find the trial court's April 18, 2017, opinion comprehensively discusses and properly disposes of the questions presented in this appeal. *See* Trial Court's Opinion, 4/18/2017, at 6-14 (concluding: (1) Bailey's motion for a mistrial was appropriately denied because (a) the

---

[3] On December 28, 2016, the trial court ordered Bailey to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Following an extension of time, Bailey filed a concise statement on February 1, 2017. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on April 18, 2017.

Commonwealth did not intentionally elicit or exploit testimony regarding Bailey's 2005 possession of a firearm charge which was *nolle prosequied*, (b) mitigation efforts were made by both attorneys to correct the mistake, and (c) the trial court provided two limiting instructions regarding the testimony at issue; (2) Bailey's motion to suppress was properly denied because Villaneuva verbally consented to the search, which gave the officers an independent lawful position from which to conduct the search, based on the common authority exception to the warrant requirement, and where (a) Villaneuva was the leaseholder and only permanent resident of the apartment, (b) she also signed a form indicating that she consented to the search, and (c) Bailey did not explicitly refuse the search, but rather, requested Villaneuva not consent to it; and (3) Bailey's request for jury instruction 16.02(b)(A) was appropriately denied because while his requested instruction for what the term, possession, means was a more detailed and descriptive definition, the firearm in question was found in a shared space, warranting an instruction on joint constructive possession, and therefore, Bailey's requested instruction would not have been helpful to the jury). Accordingly, we affirm on the basis of the trial court's opinion, but add one additional comment.

With respect to the trial court's finding that Bailey had no reasonable expectation of privacy in the apartment because he did not meet the "guest" criteria as set forth in **Commonwealth v. Govens**, 632 A.2d 1316 (Pa. Super.

1993), *appeal denied*, 652 A.2d 1321 (Pa. 1994),[4] our research has revealed that even overnight guests, which Bailey could presumably qualify as, do possess a legitimate expectation of privacy. ***See Minnesota v. Olson***, 495 U.S. 91, 99 (1990) (holding "that an overnight guest has a legitimate expectation of privacy in his host's home," reasoning, "[f]rom the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be

---

[4]

> Factors to be considered in determining whether a defendant has a legitimate expectation of privacy in another person's home include: (1) possession of a key to the premises; (2) having unlimited access to the premises; (3) storing of clothing or other possessions on the premises; (4) involvement in illegal activities conducted on the premises; (5) ability to exclude other persons from the premises; and (6) expression of a subjective expectation of privacy in the premises.

***Govens***, 632 A.2d at 1319. In ***Govens***, there was no evidence regarding the status of the appellant or the reason for his presence in the apartment. ***Id.*** at 1318. Here, the court found:

> At the time of his arrest, [Bailey] had no key to the apartment, and only had limited access to it, which was dependent upon whether Ms. Villaneuva was willing to pick him up and drive him there; [Bailey] stored no clothing or other possessions on the premises, other than the illegal firearm; [Bailey] had no ability to exclude other persons from the apartment, as he was not a resident and was not on the lease; [h]e also expressed no subjective expectation of privacy in the apartment or the bedroom, as evidenced by him asking only Ms. Villaneuva to not let the officers into the bedroom, as opposed to refusing consent to the officers themselves.

Trial Court's Opinion, 4/18/2017, at 11-12.

disturbed by anyone but his host and those his host allows inside."). ***See also Commonwealth v. Santiago***, 736 A.2d 624 (Pa. Super. 1999), *appeal denied*, 749 A.2d 470 (Pa. 2000); ***Commonwealth v. Rodriguez***, 679 A.2d 1320 (Pa. Super. 1996), *appeal denied*, 704 A.2d 577 (Pa. 1997); ***Commonwealth v. Evans***, 410 A.2d 1213 (Pa. 1979). Nevertheless, this does not affect the outcome because Villaneuva consented to the officers entering the room,[5] thereby negating any expectation of privacy Bailey may have had regarding the search.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/30/18

---

[5] Moreover, we reiterate that Bailey asked only Villaneuva to not let the officers into the bedroom, but did not say anything to them specifically. ***See*** Trial Court's Opinion, 4/18/2017, at 4.

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CRIMINAL

COMMONWEALTH OF PENNSYLVANIA   :

       v.                    :     0296-2016

FRANK BAILEY, III              :

### OPINION

BY: WRIGHT, J.                                 April 18th, 2017

..This Opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of

Appellate Procedure. In his Concise Statement of Errors, Defendant Frank Bailey, III

alleges three errors related to his Felony conviction for possession of a firearm by a

person not to possess.[1] A review of the record and applicable law demonstrates that

Defendant's claims are meritless, and his appeal should be dismissed.

### BACKGROUND

On November 30, 2015, Officers Michael Neff and Lee Billiter, assigned to the

Manheim Township Selective Enforcement Unit, were investigating a stabbing in which

Defendant was the victim. (N.T. Suppression at 4–5, 22); (N.T. Jury Trial at 127–29). At

the time, Defendant also had active arrest warrants for violating the conditions of his

parole, and his whereabouts were unknown. (N.T. Suppression at 4–5); (Criminal

Complaint, 12/11/15). In an attempt to uncover more information about the crime, the

officers went to the residence of Defendant's girlfriend, Catherine Villanueva. (N.T.

Suppression at 4–6). The officers arrived at Ms. Villanueva's second-floor apartment

---

[1] 18 Pa.C.S. § 6105(a)(1).

1

APPENDIX B

around nine or ten o'clock at night. Id. at 23, 46. Officer Neff had visited Ms. Villanueva about a month prior to that date to interview her regarding the same investigation. Id. at 6. When the officers arrived, they knocked on the door, and Ms. Villanueva answered it "a few moments later." Id. She seemed surprised to see the two officers. Id. at 7. Officer Neff then asked her if she remembered him being there previously to talk about Defendant, and she said that she did. Id. He then asked her if she would let the officers come in, and she said "yes" or "something to that effect," and allowed the officers to enter the apartment. Id. at 6–7. The door opened directly into a living room area, and upon entering, the officers remained "just inside the threshold of the door." Id. at 7, 26–27. The apartment had a living room, a kitchen, and one bedroom. Id. at 8. The bedroom door was closed when the officers arrived. Id.

After entering the apartment, Officer Neff had a "very brief" conversation with Ms. Villanueva, telling her that there were some inconsistencies he wanted to clear up based on his previous interview with her. Id. at 7–8. Specifically, he asked her if she remembered talking to the officers about "Frank," and whether she had talked to him recently or knew where he was. Id. Ms. Villanueva responded that she had talked to him to check on his recovery. Id. at 8. During this exchange, Officer Billiter noticed there were "two dinner plates of food sitting out," and based on this observation, stated "something to the effect of, he is here, as in the apartment somewhere." Id. Officer Neff then asked Ms. Villanueva where Defendant was, and she "kind of hung her head and motioned towards the bedroom" by moving her head in that direction. Id at 9. The two

2

officers then started moving toward the bedroom door, but "before [they] even got to the bedroom, the door opened and Mr. Bailey emerged." Id. at 9, 49–51.[2]

Defendant was not living at the apartment at the time of his arrest, and was not on the lease.[3] According to Ms. Villanueva's testimony at the suppression hearing The Friday prior to the arrest, November 27, 2015, she had no contact at all with Defendant. Id. at 44. However, the following day, Saturday, November 28, 2015, Ms. Villanueva picked Defendant up from Elizabethtown after work, and he stayed at the apartment overnight. Id. at 44. On Sunday night, November 29, 2015, Ms. Villanueva brought Defendant back to Elizabethtown on her way to work. The Monday after that, November 30, 2015, the day of Defendant's arrest, Ms. Villanueva went to work, went on a date with a different person, and then after a phone call from Defendant, picked him up again. Id. at 44–45. After stopping at a liquor store, she then brought him back to her apartment. Id.[4] Only she and Defendant had access to the bedroom on November 29 and 30. (N.T. Jury Trial at 170).

After Defendant exited the bedroom, the officers handcuffed him based on the outstanding warrant. Id. at 9. Once handcuffed, Defendant was searched, and Officer

---

[2] Ms. Villanueva testified that she never consented to the officers entering her apartment, that when they arrived she stepped outside leaving the door open a crack, and they then immediately accused her of lying during their previous visit, and stated that they "had" to come in. (N.T. Suppression at 46–48). After the brief discussion, they entered the apartment without consent and she followed them in. Id. at 47. She also stated that the officers were not standing "just inside the door," when they were inside, and that when Officer Billiter said Defendant was there, she only looked down, and never gestured toward the bedroom. Id. at 48. Ms. Villanueva did not dispute however that Defendant then came out of the bedroom before the officers reached the door. Id. at 51.

[3] Defendant did previously lived at the apartment for about two and a half months before moving out in August, 2015. (N.T. Suppression at 45).

[4] At trial, Ms. Villanueva contradicted this testimony, stating that Defendant did not stay overnight that Saturday, bud did stay overnight the Sunday prior to the day of his arrest. (N.T. Jury Trial at 165, 174); (N.T. Suppression at 44). Ms. Villanueva also testified at trial that Defendant never had access to her car, but was then confronted with her prior inconsistent statement to police. In that statement, Ms. Villanueva stated that Defendant did have access to her apartment without her present, and that he had her car "Sunday night about 8:30 to midnight." (N.T. Jury Trial at 169).

3

Neff then asked if there was anything in the bedroom that Defendant needed or if there was anything in there the officers should know about. Defendant responded that there was "nothing in the bedroom" and "yelled that [sic] to Ms. Villanueva that this was about him and not about her bedroom and not to let [the officers] go in the bedroom." Id at 10–11. Officer Neff testified that these comments were directed at Ms. Villanueva, not the officers, and that Defendant was looking at her when the statements were made. Id. at 11.[5] Officer Neff then took Defendant outside to an awaiting patrol car in which he was transported to the police station. Id.[6]

When Officer Neff returned, he asked Ms. Villanueva if there was anything in the apartment "that would be trouble for her, drugs, guns, [or] contraband." Id. at 12. She responded "not that I know of." Id. Officer Neff was prompted to ask this question because he could see a partially burnt marijuana cigar sitting on the kitchen counter. Id.; (N.T. Jury Trial at 206). Officer Billiter then pointed the marijuana out to Ms. Villanueva, and Officer Neff asked for her consent to search the apartment. (N.T. Suppression at 13). Ms. Villanueva responded by stating "I don't know why you need to. I don't think there's anything here." Id. In response, Officer Neff again reminded her of the marijuana on the counter, and asked again for her consent to search. Id. Ms. Villanueva then asked what would happen if the officers found something, to which Officer Neff responded that he couldn't say for sure, and that it would depend on what was found. Id. He then asked again for consent, and she said "yes, go ahead, search all you want."

---

[5] Oddly, Ms. Villanueva testified that she did not remember Defendant saying anything, nor did she remember any of the officers asking if there was anything in the bedroom they should know about. (N.T. Suppression at 51).
[6] In contrast, Ms. Villanueva testified that Officer Billiter told Defendant to get down on the ground before arresting him, and that then two additional officers entered the apartment to take him away. (N.T. Suppression at 51).

4

Id.[7] When Officer Neff made the requests, he was sitting on the couch next to Ms. Villanueva, he was exhibiting a calm demeanor, and that Ms. Villanueva seemed calm as well. Id at 14. After her verbal consent, Officer Neff wrote up a consent form on a notepad, handed it to her, and she signed it. Id.[8]

After she signed the consent form, the officers searched Ms. Villanueva's bedroom. On top of her five-year-old daughter's bed, they found a Men's size 10 Converse shoe box.[9] Officer Neff "flipped the shoebox open and saw a beige whitish towel laying inside the shoebox. [He] lifted it up and out fell a pistol," which became the firearm in question in this case.[10] (N.T. Jury Trial at 134, 164).

Aside from the instant charge, Defendant has the following criminal history: (1) Disorderly conduct (4/19/05);[11] (2) Six counts relating to driving under the influence of marijuana while his operating privilege was suspended or revoked, and without required financial responsibility (2/21/06);[12] (3) possession with intent to deliver crack cocaine and criminal conspiracy to deliver crack cocaine (7/17/06);[13] (4) Driving while License Suspended/Revoked and blood-alcohol level above .02% (02/26/09);[14] (5) Disorderly

---

[7] Ms. Villanueva initially testified that she never gave consent to search, but then admitted that she did consent but only after the officers insisted, threatened to call child services, and told her they had probable cause. She also added that she consented because she had "nothing to hide." (N.T. Suppression at 53–54).

[8] Ms. Villanueva testified that "officer present gave a blank piece of paper and I signed saying consent." (N.T. Suppression at 62).

[9] Ms. Villanueva's shoe size is eight and a half. (N.T. Jury Trial at 170).

[10] The pistol was a loaded revolver stamped 1944. (N.T. Jury Trial at 134, 164, 182).

[11] 18 Pa.C.S. § 5503; MJ-02201-CR-0000125-2005 (Misdemeanor 3).

[12] 35 Pa.C.S. § 780-113(a)(31) (possession of marijuana-small amount for personal use); 35 Pa.C.S. § 780-113(a)(32) (possession of drug paraphernalia with intent to use); 75 Pa.C.S. § 3802(d)(1)(i) (driving under the influence of a schedule I controlled substance); 75 Pa.C.S. § 3802(d)(2) (driving while impaired by a controlled substance); 75 Pa.C.S. § 1543(a) (driving while operating privileges suspended or revoked); 75 Pa.C.S. § 1786(f) (operation of a motor vehicle without required financial responsibility); CP-36-CR-0002022-2005.

[13] 35 P.S. § 780-113(a)(30); 18 P.S. § 903(a)(1); CP-36-CR-0005295-2005.

[14] 75 Pa.C.S. § 1543(b)(i); CP-36-SA-0000290-2008.

5

Conduct and Possession of Marijuana (10/20/10);[15] (6) Harassment (3/17/11);[16] (7) False Identification to Law Enforcement and Open Container (6/14/12);[17] (8) Delivery of Cocaine (10/27/14);[18] (9) Possession of Marijuana (5/28/15);[19] and shortly after being convicted on the instant charge, Defendant was also convicted on (10) DUI, 2nd Offense, and related charges (11/23/16).[20]

## DISCUSSION

Defendant's Concise Statement alleges three points of error:

1. That I should have granted Defendant's motion for a mistrial because the Clerk of Courts, while reading into the record the defendant's prior felony drug convictions for purposes of proving Defendant was a persons not to possess a firearm, also read that Defendant had a prior firearms charge;

2. That I erred in denying Defendant's Motion to Suppress because Defendant did not consent to the search of the bedroom in which he had been an overnight guest;

3. That I erred in denying Defendant's request for Jury Instruction 16.02(b)(A) to be read to the jury, which is the controlled substance possession definition.

### 1. Defendant's Motion for a Mistrial Was Appropriately Denied

The standard for determining whether to grant a mistrial is well established:

A mistrial is an "extreme remedy ... [that] ... must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial." Commonwealth v. Vazquez, 617 A.2d 786, 787-88 (Pa. Super. 1992) (citing Commonwealth v. Chestnut, 511 Pa. 169, 512

---

[15] 18 Pa.C.S. § 5503(a)(4); 35 Pa.C.S. § 780-113(a)(31); CP-36-CR-0005042-2010.
[16] 18 Pa.C.S. § 2709 § (a)(1); CP-36-CR-0004042-2010.
[17] 18 Pa.C.S. § 4914; LO 88-2; CP-36-CR-0003935-2012.
[18] 35 P.S. § 780-113(a)(30); CP-36-CR-0003342-2012 affirmed 2118 MDA 2014 (Pa. Super. 2015).
[19] 35 P.S. § 780-113(a)(31); CP-36-CR-0003014-2015.
[20] 75 Pa.C.S. § 3802; 75 Pa.C.S. § 3802(a)(1); 75 Pa.C.S. § 1543; CP-36-CR-0000672-2016.

A.2d 603 (Pa.1986), and Commonwealth v. Brinkley, 505 Pa. 442, 480 A.2d 980 (Pa.1984)). A trial court may remove taint caused by improper testimony through curative instructions. Commonwealth v. Savage, 529 Pa. 108, 602 A.2d 309, 312-13 (Pa.1992); Commonwealth v. Richardson, 496 Pa. 521, 437 A.2d 1162 (Pa.1981). Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. Richardson, 496 Pa. at 526-527, 437 A.2d at 1165. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference, and whether the curative instruction was appropriate. Id.

Commonwealth v. Manley, 985 A.2d 256, 266–67 (2009).

Moreover, we have often indicated that in criminal cases, the possible prejudicial effect of a witness's reference to the prior criminal conduct of a defendant may, under certain circumstances, be removed by an immediate cautionary instruction to the jury. Commonwealth v. Richardson, 496 Pa. 521, 437 A.2d 1162 (1981); Commonwealth v. Povish, 479 Pa. 179, 387 A.2d 1282 (1978). The nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required. Commonwealth v. Williams, 470 Pa. 172, 368 A.2d 249 (1977).

Commonwealth v. Pursell, 495 A.2d 183, 192 (1985).

Finally, "[t]he decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a 'flagrant abuse of discretion.'" Commonwealth v. Manley, 985 A.2d 256, 266–67 (2009) citing Commonwealth v. Cottam, 616 A.2d 988, 997 (Pa. Super. 1992); Commonwealth v. Gonzales, 609 A.2d 1368, 1370–71 (Pa. Super. 1992).

Here, Defendant challenges the elicitation of Defendant's possession of a firearm charge from docket 5295-05, which was *nolle prosequied*. (Sentencing Order, 7/17/06); (Statement of Errors, 2/1/16). This charge was elicited during Assistant District Attorney Julie Slabinski's direct examination of Jacqueline Pfursich, the Lancaster County Clerk of Courts:

7

Q: What is the full caption of the case name?

A: Defendant Frank Bailey, III

Q: And you stated it was July –

A: 7/17/06

Q: And what occurred on 7/17/06

A: It appears that, based upon the sentencing order, that Frank Bailey, III was sentenced to various counts. Do you want me to read the counts?

Q: Yes

A: Count 1, the offense of VCS. That was a felony. He was committed to two to four years, assessed fines and costs.

Q: Was the second count there a conspiracy charge?

A: That is correct.

Q: And are there any remaining counts on there?

A: There are.

Q: Is it a communication facility?

A: Yes, a firearms charge and possession.

Q: And the paperwork that you have there has the certified stamp on it, the official seal on it?

A: Yes.

(N.T. Jury Trial at 222–23).

Immediately after that line of questioning, Defendant's attorney, Douglas Conrad, moved for a mistrial at sidebar and I denied the motion. Id. at 223. ADA Sablinski then continued her questioning, but clarified through Ms. Pfursich that Defendant was only convicted of the Violation of Controlled Substance (VCS) charge and a conspiracy charge, and that the communication facility and firearm charges were *nolle prosequied*:

8

Q: What does that mean?

A: They were effectively dismissed

Q: So they don't count against the defendant in any way?

A: That is correct.

Id. at 223–24.

On cross-examination, Mr. Conrad also clarified with Ms. Pfursich that Defendant

had no firearm convictions:

Q: *Nol pros* means it was dismissed? That charge was not pursued?

A: That is correct.

Q: And there, in fact, is no conviction on any firearm offense for my client?

A: Based upon the two sentencing orders that I have in front of me, that's accurate.

Id. at 225.

I then also issued a limiting instruction to the jury regarding the nolle prosequied

charges:

Ladies and gentlemen, I'm going to instruct you that a judgment of *nol pros* or entry of *nol pros* means there was no factual basis that the Commonwealth had to pursue particular charges. When you heard the reference to charges that were *nol prossed*, that means there was no factual basis to pursue it. Therefore, it's completely irrelevant to any consideration in this case.

Id.

At the end of the trial, I also issued a second limiting instruction to the jury:

There was also evidence to the effect that the defendant had a prior criminal conviction. By that I mean the reference to convictions for possession with intent. This is not evidence of the defendant's guilt in this case. You must not infer in this case from this evidence of a prior conviction that the defendant is guilty. This evidence may be considered for you for only one purpose and that is to determine whether or not the Commonwealth has

9

proven its case as a prior conviction for certain offenses is an element of the crime. I also caution you to the fact that a reference to any charge that was nol prossed means those charges were not prosecuted and there lacked a factual basis for ever bringing those charges. You should disregard anything mentioned along those lines.

Id. at 258.

While Assistant District Attorney Slabinski did elicit the testimony, I do not believe she elicited it intentionally, and she certainly did not exploit the testimony. Instead, after defense counsel Conrad objected, she took immediate measures to correct the mistake by having her witness explain that the *nolle prosequied* charges were not convictions and were effectively dismissed. Mr. Conrad then clarified this again on cross-examination, and I thereafter issued a limiting instruction, and then issued a second limiting instruction at the end of the trial. Because of the mitigation efforts taken by both attorneys, and due to both limiting instructions, I properly concluded that the "extreme remedy" of a mistrial was not necessary in this case.

## 2. Defendant Was Not Entitled to Suppression Because He Had No Reasonable Expectation of Privacy in the Apartment, and the Lease-holder Consented to the Search

Pennsylvania law confers standing automatically on a defendant when possession at the time of the contested search is an essential element of the prosecution. Commonwealth v. Bostick, 958 a.2d 543, 552 (Pa. Super. 2008). However, to prevail on a suppression motion, a defendant still must show (1) a subjective expectation of privacy in the area searched or effects sized at the time of the search, and (2) that such expectation was "objectively reasonable, i.e., that he had a legitimate expectation of privacy." Commonwealth v. Torres, 764 A.2d 532, 542 (Pa. 2001)

10

(holding that defendant failed to show subjective expectation of privacy where he testified that while he was a co-leaseholder, he "did not own the apartment . . . did not live there," and "someone else lived there."). Stated differently, the objective component requires that the "subjective expectation of privacy is one that society is willing to recognize as legitimate." Commonwealth v. Gordon, 683 Pa. 253, 256–57 (Pa. Super. 1996) (man living in abandoned house had no objective expectation of privacy where he had installed a working television, had a milk crate, a lamp, and a "beer ball").

"An expectation of privacy is present when an individual, by his conduct, exhibits an actual expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable." Commonwealth v. Brundidge, 620 A.2d 1115, 1118 (Pa. 1993) (citations and quotations omitted). "This determination is to be accomplished upon a totality of the circumstances." Commonwealth v. Ferretti, 577 A.2d 1375, 1378 (Pa. Super. 1990) appeal denied 589 A.2d 688 (Pa. 1991). Pennsylvania courts consider six specific factors in determining whether a guest has a reasonable expectation of privacy in the dwelling of another:

> [A]n occupant other than the owner or lessee of an apartment [must] demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy." United States v. Garcia, 741 F.2d 363, 366 (11th Cir.1984). Factors to be considered in determining whether a defendant has a legitimate expectation of privacy in another person's home include: (1) possession of a key to the premises; (2) having unlimited access to the premises; (3) storing of clothing or other possessions on the premises; (4) involvement in illegal activities conducted on the premises; (5) ability to exclude other persons from the premises; and (6) expression of a subjective expectation of privacy in the premises.

Commonwealth v. Govens, 632 A.2d 1316, 1319 (Pa. Super. 1993).

Here, Defendant has not met any of these criteria. At the time of his arrest, he had no key to the apartment, and only had limited access to it, which was

11

dependent upon whether Ms. Villanueva was willing to pick him up and drive him there; Defendant stored no clothing or other possessions on the premises, other than the illegal firearm; Defendant had no ability to exclude other persons from the apartment, as he was not a resident and was not on the lease; He also expressed no subjective expectation of privacy in the apartment or the bedroom, as evidenced by him asking only Ms. Villanueva to not let the officers into the bedroom, as opposed to refusing consent to the officers themselves. Defendant also cannot be said to have had a reasonable expectation of privacy in the shoebox itself, as it contained no identifying information, was not sealed, and was left on Ms. Villanueva's five-year-old daughter's bed.

Notwithstanding Defendant's lack of a reasonable expectation of privacy in the apartment, Ms. Villanueva's consent would still have given the officers an independently lawful position from which to conduct the search based on common authority doctrine:

The "common authority" exception to the warrant requirement is well established:

[I]t is firmly established that a warrantless search of property is permitted when consent is given by a third party possessing "common authority" over the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171 n. 7, (1974). Commonwealth v. Latshaw, 392 A.2d 1301 (Pa. 1978), cert. denied, 441 U.S. 931 (1979).

Commonwealth v. Davis, 743 A.2d 946, 951 (Pa. Super. 1999). Such a warrantless search is only invalid over the express refusal of a physically present co-occupant. Commonwealth v. Yancoski, 915 A.2d 111, 113 (Pa. Super. 2006).

Ms. Villanueva, as the leaseholder and only permanent residence of the apartment (aside from her daughter) had common authority over the apartment. The

12

testimony at the Suppression Hearing and the signed consent form also indicated that she consented to the search. Defendant never expressly refused the search, but rather, requested that Ms. Villanueva not consent to it.

Accordingly, the search was lawful as to Defendant both because he had no objective or subjective expectation of privacy in the apartment, and because Ms. Villanueva independently consented to the search.

### 3. Defendant's Request for Jury Instruction 16.02(b)(A) Was Appropriately Denied

Defendant argues in his Concise Statement that my instruction on possession at trial did not adequately present the law of possession to the jury. (Statement of Errors, 2/1/17). Instead, Defendant argues that I should have granted his request to present Jury Instruction 16.02(b)(A), which is the "controlled substance possession definition and is a more detailed and more descriptive definition as to what the term possession means." Id. Defendant's assertion is meritless.

> "[I]t is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error."

Commonwealth v. Antidormi, 84 A.3d 736, 754 (Pa. Super. 2013).

Here, the firearm in question was found in a shared space, warranting an instruction on "joint constructive possession," which requires a finding of both power to control the weapon, as well as intent to exercise that control.[21] I therefore instructed the jury as follows, reading the instruction twice:

> For a person to possess the firearm, he must have the intent, control, and power to control the firearm.

---

[21] Commonwealth v. Boatwright, 453 A.2d 1058, 1059 (Pa. Super. 1982).

13

(N.T. Jury Trial at 262, 263).

In explicitly reading the elements of joint-constructive possession of a firearm, I submit that the instruction clearly, adequately, and accurately presented the law to the jury. By extension, notwithstanding Defendant's contention that Standard Jury Instruction 16.02(b)(A) (instruction for possession of a *controlled substance*) would have been "more detailed, and more descriptive," I appropriately exercised my broad discretion in determining it would not be helpful to the jury to include it.[22]

## CONCLUSION

...... Defendant was not entitled to a mistrial, his suppression motion was appropriately denied, and the jury instruction on possession was sufficient. Accordingly, Defendant's appeal is meritless and should be dismissed.

---

[22] Indeed, our Superior Court addressed this issue where the Trial Court presented a similar instruction to the jury. Commonwealth v. Magwood, 538 A.2d 908, 910 (Pa. Super. 1988) (where trial court instructed jury on joint-constructive possession in possession of a firearm case, it was not also required to read Standard Jury Instruction 16.02(b)(A)).

14

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## CRIMINAL

COMMONWEALTH OF PENNSYLVANIA     :

      v.                     :       0296-2016

FRANK BAILEY, III              :

## ORDER

BY: WRIGHT, J.                        April 18 , 2017

AND NOW, this 18ᵗʰ day of April, 2017, the Court hereby submits this Opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

The Clerk of Courts is directed to forward the record to the Superior Court.

BY THE COURT:

JEFFERY D. WRIGHT
JUDGE

Copies to:

District Attorney's Office
Diana Kelleher, APD

CLERK OF COURTS
2017 APR 18 AM 9: 45
LANCASTER COUNTY, PA